[No. S014497. Jan. 24, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNIS HAROLD LAWLEY, Defendant and Appellant.

COUNSEL

Scott F. Kauffman, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Robert R. Anderson, Assistant Attorney General, Stephen G. Herndon, Ward A. Campbell, Shirley A. Nelson, Laura I. Heidt and David Andrew Eldridge, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WERDEGAR, J.—Following a trial at which he represented himself with the assistance of advisory counsel, a Stanislaus County jury convicted Dennis Harold Lawley of single counts of murder (Pen. Code, § 187),[1] conspiracy to commit murder (§ 182, subd. (a)(1)) and solicitation to murder (§ 653f, subd. (b)). The jury also found true an arming allegation (§ 12022, subd. (a)) and a financial-gain special-circumstance allegation (§ 190.2, subd. (a)(1)). The same jury subsequently found the appropriate penalty for the murder and conspiracy counts to be death; the trial court imposed sentence accordingly. This appeal is automatic. (§ 1239, subd. (b).)

We shall vacate as unauthorized the special circumstance finding and sentence of death on the conspiracy count; modify the judgment to direct the trial court to amend the abstract of judgment to provide for a sentence of imprisonment for 25 years to life, stayed pursuant to section 654, on the conspiracy count; and otherwise affirm the judgment, including the murder and conspiracy convictions and the sentence of death for the murder count.

FACTS

*Guilt phase*

1. *Prosecution evidence*

On January 22, 1989, George Silva, Jr., was living on the southeast corner of Keyes and Jennings Roads in Stanislaus County. That evening, Silva, who was familiar with firearms and the sound of gunfire, heard what sounded like three large-caliber pistol shots. After each shot, Silva heard a "thud," as if an object were being struck by the shots. Shortly after the shots were fired,

---

[1] Unless otherwise specified, all further statutory references are to the Penal Code.

Silva heard a car drive at a high speed past his house and observed a car driving westbound toward Jennings Road. The time was approximately 7:45 p.m.

Between 7:30 and 7:45 p.m. that same evening, Kay Spencer was driving in the vicinity of Keyes and Jennings Roads. As she turned north onto Jennings Road from West Main, she saw the taillights of a vehicle about one-quarter to one-half mile in the distance ahead of her. As the other car negotiated a curve, its taillights disappeared from view. When Spencer turned east on Keyes Road, she saw what appeared to be the same distinctive taillights on a car stopped about a quarter-mile from the intersection. The car was an older-model full-size sedan, dark green or brown in color. Although she was not positive, she believed the brake lights were on. Spencer testified she thought she saw three people around the car: at the open trunk, a dark-haired man of medium height, apparently in his mid-20's; on the right-hand side of the vehicle, a slighter, sandy-haired man walking toward the back of the car; and a third person Spencer could not describe.

About 8:00 p.m. that evening, while driving eastbound with his girlfriend on Keyes Road toward Crows Landing, Hubert Blake observed a pair of legs protruding onto the road. Looking closer, he saw a man lying facedown, his body half on the road and half on the adjacent dirt. Blake drove back down the road to a trailer occupied by Phil Silva, whom he had been visiting earlier that evening, had his girlfriend direct the occupants to call 911, and drove back to the scene. After determining the man was dead, Blake covered him with a towel.

The victim, later identified as Kenneth Lawton Stewart, had suffered two gunshot wounds to the back of the head. Abrasions on his face were consistent with his being shot in the back of the head while lying facedown. A fragment of a bullet jacket or casing was found entangled in Stewart's hair; another fragment was discovered approximately four to six feet north of his head. Underneath the body was blood and brain matter; blood was also present on the dirt and asphalt. Police also found two moist oil stains on the roadway near the body.

After learning, the next day, that a body had been found on Keyes Road, Kay Spencer contacted the Stanislaus County Sheriff's Department. When Spencer showed Sheriff's Detective Gary Deckard where she had seen the stopped vehicle, he told her it was the same general area where the body was found.

Stewart had been released from the Deuel Vocational Institute at Tracy four days before his death. Stewart had a reputation for robbing drug dealers

of cash and drugs. After his release, he had frequented Del Rio Mobile Home Park in Modesto, also known as Butler's Camp. Butler's Camp consisted of a number of trailers and small cabins. Since early December 1988, defendant had been renting a cabin at Butler's Camp. In January 1989, defendant's cabin was the scene of much drug dealing.

Ricky Black was one of several people charged with Stewart's murder and was technically facing the death penalty. Black had also been charged with kidnapping Stewart. Black testified for the prosecution at defendant's trial under a grant of immunity and on the assumption the charges concerning Stewart, as well as drug sale charges pending against him, would be dismissed. He acknowledged that if his role in Stewart's murder was greater than he had previously admitted, his deal with the prosecution was off. Black admitted he was a heroin addict with prior felony convictions for grand theft, petty theft with a prior, and being a felon in possession of a firearm.

Black testified he knew both defendant and Stewart and had purchased drugs at defendant's cabin, usually from someone other than defendant. On the night of Stewart's murder, Black had been with Stewart in Butler's Camp in the cabin of Lawrence Woodcock. Black had just left Woodcock's cabin and was walking down a back street about half a block from defendant's cabin when Brian Seabourn, who Black indicated had some mental problems, drove up in a brown car. Black had previously seen Seabourn with guns, although he did not observe a gun on this occasion. Seabourn asked Black if he knew Stewart and knew where he was. Seabourn told Black he wanted to kill Stewart and needed his help. Knowing Stewart was still in Woodcock's cabin, Black offered to lure him out by telling him Seabourn wanted to do a drug robbery. Black went to Woodcock's cabin and returned to Seabourn's car with Stewart. He introduced the two men and got into Seabourn's car along with Stewart. Seabourn drove a short distance to a small store, where Black got out despite Seabourn's asking him to stay. That was the last time Black saw Stewart.

Black learned of Stewart's death the next day. When he talked with Seabourn after the crime, Seabourn told him he had killed Stewart and buried the murder weapon. Black testified he did not know of anyone who "had anything else to do with this." After Stewart's murder, Black was in possession of a knife Stewart had stolen from Freddie Salas; Black testified Stewart had given him the knife.

A few days before the murder, probably on Thursday, January 19, 1989, Black had entered defendant's cabin just as Stewart was finishing robbing and assaulting defendant. He observed the two men fighting and Stewart

running out the cabin door, pursued by defendant. When defendant returned to the cabin, he began to fight with Black, apparently believing he had been with Stewart. Afterward, Black tried to convince defendant he had had nothing to do with the robbery.

Treva Coonce testified for the prosecution at defendant's May 12, 1989, preliminary hearing and at his trial, under a grant of immunity. She also testified at Brian Seabourn's preliminary hearing and gave several interviews, on April 14, 1989, and subsequently, to Stanislaus County Sheriff's Detective Gary Deckard. Coonce's various statements often contradicted each other, and she repudiated her prior statements and testimony on a number of occasions. Coonce was a heroin addict who was in jail and going through withdrawal at the time she made her April 14 statement to Detective Deckard. Despite her grant of immunity, at defendant's trial Coonce continued to repudiate her earlier statements implicating defendant and Seabourn. Consequently, most of the incriminating evidence elicited from Coonce during defendant's trial came in the form of readings from her May 12 preliminary hearing testimony and statements made to Deckard on April 14 and subsequently. The following account is derived from Coonce's trial and preliminary hearing testimony and from the testimony of Detective Deckard.

For a week to 10 days in early January 1989, Treva Coonce stayed in defendant's cabin at Butler's Camp. She left after an argument with defendant, eventually moving into the trailer next door. Coonce was the girlfriend of Steven Mendonca, who was also charged with Stewart's murder and ultimately pleaded guilty to second degree murder.[2] Coonce had also known Stewart for several years. About a week before Stewart's murder, while in her trailer next to defendant's cabin, Coonce overheard a fight between defendant and Ricky Black. Afterward, defendant and Black sat down on the porch together. Coonce did not see Stewart at defendant's cabin and did not recall seeing defendant bruised or cut after the fight.

Coonce told Detective Deckard, and testified at defendant's May 12 preliminary hearing, that a few days after the robbery and assault on defendant she was present in defendant's cabin with Mendonca, Seabourn, defendant, Tom Bourchier and other people she could no longer recall. Defendant was "fuming" over the robbery and said he would "do anything to have [Stewart] taken care of." Defendant said he "would pay to have that

[2]*People v. Mendonca* (Super. Ct. Stanislaus County, 1990, No. 255043). Defendant requests that the court take judicial notice of the court files and transcripts in Mendonca's case; we grant the request. (See Evid. Code, §§ 452, subd. (d) [judicial notice may be taken of the records of any court of this state], 452.5 [pertaining to court records relating to criminal convictions].)

mother fucker killed." Seabourn responded that they might "work something out." Coonce thought this was all "just big talking." Several business transactions were going on in the cabin at the time, and Coonce overheard discussion about an exchange of several thousand dollars related either to killing Stewart or to drug sales. Coonce saw defendant give money to Seabourn, perhaps more than $1,000 but less than $5,000, but could not say it was for killing Stewart. Coonce told Detective Deckard that defendant had paid Seabourn $3,000 and an ounce of cocaine. She also told Deckard that Bourchier had given Seabourn the money. Coonce testified she had seen defendant with a .357 gun, that she always saw Seabourn with a gun, she sometimes saw Bourchier with a gun, but she never saw Mendonca with a gun. On a number of occasions she saw Seabourn with thousands of dollars, but she could not say it was compensation for killing Stewart.

On the night of January 22, 1989, Coonce was in her trailer when Seabourn and Mendonca returned from killing Stewart. Coonce went outside and saw defendant direct Bourchier to give Seabourn $2,000. About 5:00 a.m. on the morning after the murder, Mendonca returned to Coonce's trailer and spoke with her. He had an "eight-ball" of heroin that he said he had found between the trailer and defendant's cabin. Mendonca told Coonce that after the murder he and Seabourn had taken the car used in the murder to a car wash to clean out blood and other matter.

Some weeks after the killing, Mendonca told Coonce the gun used to kill Stewart had been buried or thrown into water. Bourchier also told Coonce the gun had been buried.

At defendant's trial, Coonce repudiated her prior statements and testimony incriminating defendant and others. She denied being present in defendant's cabin and overhearing a discussion regarding killing Stewart. She denied seeing any exchange of money between defendant and Seabourn or Bourchier and Seabourn. At Seabourn's preliminary hearing, Coonce repudiated most of her statements to Detective Deckard, saying she had made the statements in order to get out of jail. She also repudiated the testimony she gave at defendant's May 12 preliminary hearing. At the present trial, Coonce testified she had lied at defendant's preliminary hearing and that anything she previously had told police or testified to was based on hearsay. She denied telling Sharon Tripp, another Butler's Camp associate, before Seabourn's preliminary hearing, that she would lie at that proceeding.

Following Seabourn's preliminary hearing, Coonce suffered endocarditis and a stroke brought on by injecting heroin mixed with river water. She was interviewed in the hospital by Detective Deckard and told him she had lied at Seabourn's preliminary hearing out of loyalty.

The day before Coonce testified at defendant's May 12 preliminary hearing, she wrote a letter to Mendonca, stating she knew nothing about Stewart's murder, that she hated defendant and didn't know what she would say at the hearing.

Sharon Tripp testified she was staying at defendant's cabin off and on around the time of the murder. She was acquainted with defendant, Seabourn, Mendonca, Coonce and Stewart. She had no felony convictions, but was using heroin in January 1989. On a Sunday morning in that month, she entered the cabin and saw defendant lying on a couch with scrapes on his hand and blood on his jacket. Defendant told her that the night before he had been robbed by Kenny Stewart and he would "like to kill the mother fucker." He had a gun tucked into the front of his pants.

At the time of Brian Seabourn's arrest for the Stewart murder, a brown two-door Buick sedan was impounded from in front of Seabourn's parents' house. Upon starting the vehicle and letting the engine run for approximately 10 minutes, Detective Deckard ascertained it had an oil leak. Deckard submitted samples of the fluid leaking from Seabourn's car and of the oil found at the scene of the murder to the California Department of Justice for analysis, but examiners were unable to determine whether the two substances came from the same source. Deckard had Kay Spencer view the vehicle, including the illuminated brake lights and taillights; Spencer testified the vehicle was consistent in all respects with the one she had seen on Keyes Road on the night of January 22.

A search of defendant's cabin on January 24, 1989, yielded, among other items, a loaded Ruger .357 magnum pistol, a camouflage holster, and unexpended .357 magnum Federal Grant cartridges. Criminalist William Jerry Chisum of the California Department of Justice compared bullet fragments found in, on, or near Stewart with bullets fired from the .357 magnum pistol found in defendant's cabin, concluding that the gun had fired the shot that killed Stewart.

When shown the .357 magnum pistol found in defendant's cabin in the course of the January 24 search, witness Charles Anderson identified it as the same weapon he had purchased from his son, also named Charles Anderson, in October or November 1988. Charles Anderson, Sr., had subsequently sold the gun to his son David in either November or December 1988. At the time he sold the gun to David, it had the same camouflage holster later found in defendant's cabin.

David Anderson (Anderson) testified he visited defendant's cabin approximately six to eight times in mid-January 1989. Defendant was then in

possession of large quantities of cocaine and heroin, which he sold to Anderson and others. On his first visit to defendant's cabin, Anderson took along the chrome-plated .357 magnum Ruger pistol that he had bought from his father, Charles Anderson, showed it to defendant and discussed selling it to him. Defendant did not want to pay the $150 asking price, but wanted to trade drugs and money. Defendant, who bore signs of having been beaten, told Anderson he had been robbed.

Anderson testified that, on his second visit to defendant's cabin, his gun was stolen. He had parked his Dodge truck near the cabin, placed the gun under the front seat, and entered the cabin. The place was filled with people buying and using drugs. Thomas Bourchier walked up to Anderson and asked him what he wanted. Anderson replied he didn't know yet. A prostitute then approached Anderson and tried to make a "date" with him. Thereafter, Anderson discovered that the gun, some tools and a box of shells were missing; he surmised the woman had purposely distracted him so someone could steal his gun. He reported the theft of the gun to Detective Jack Smith of the Modesto Police Department.

The next day, Anderson returned to Butler's Camp to gather information for Detective Smith, who was paying him in gas money and for whom he had provided information in the past. Anderson entered defendant's cabin and there encountered defendant, who was selling drugs, Bourchier, Seabourn and several other people. Coonce and Mendonca soon arrived. Defendant had been badly beaten—he had a black eye, a cut on his lower lip, and a cut across his right knuckle, and he walked with a limp. When Anderson asked what had happened, defendant said he had been beaten up and robbed, that his assailant had taken all his money and drugs, and he was almost out of business. When Anderson asked defendant if he knew who had done it, defendant did not speak directly to him, but mentioned the name "Stewart." Defendant stated he had things taken care of and that "[i]f the son of a bitch comes back he's a dead mother-fucker."

Bourchier, at defendant's direction, cleared the cabin of everyone but people doing business. Bourchier asked Anderson what he wanted. Anderson told him he wanted "a dime of white" (cocaine) and "a dime of black" (heroin). Bourchier told him to sit at the kitchen table and wait. Anderson complied. Sitting at the table, Anderson faced the bathroom. Defendant, who had Anderson's gun holster down the front of his pants, containing a chrome gun that Anderson believed was his, went into the bathroom with Coonce and Mendonca. The bathroom door was open about an inch and a half. Anderson could see Coonce, but not defendant or Mendonca. Anderson heard the three talk of a man having been beaten up for drugs and having lost

$2,500 and a considerable amount of drugs. From inside the bathroom, Anderson heard defendant say, "I got this. I want this done. I got the means to get it done." Defendant also said, "I can give you some tonight, but . . . you won't get the rest until it is done, and I want my property back." Anderson testified Mendonca said, "We know right where he is. I can get the job done." Anderson saw a hand go into a woman's purse and an object he believed was his gun. When the three emerged from the bathroom, Coonce was carrying a purse and neither defendant nor Mendonca had the gun. Mendonca said he wanted some drugs, he was going to take off, it would be fast, and it would be that night. Defendant packaged some cocaine in a sandwich bag. When Coonce asked for some "black," defendant took approximately a quarter-ounce of heroin out of his pocket, cut off a quarter-gram piece, and gave the drugs to Coonce and Mendonca. Defendant told them, "If you want the rest you have got to get the job done and I want my property back." Coonce and Mendonca then left the cabin. Defendant turned to Anderson and asked him what he wanted. Anderson replied, "I want a dime of white and a dime of black." Thereafter, Anderson left the cabin. On cross-examination, Anderson testified he was an ex-heroin addict and was not currently using heroin; he had previously acted as a paid police informant.

### 2. Defense evidence[3]

Alice Seabourn, Brian Seabourn's mother, testified to the effect that Seabourn was at her house at the time Stewart was murdered. Her friend, Martha Pearson, and Brian's sister, Charlotte Navarro, testified similarly. Criminalist Sara Yoshida testified she had examined Alice Seabourn's car for bloodstains and found no evidence relating to Stewart's murder.

As noted above (ante, at p. 113), defendant waived his right to the assistance of counsel and represented himself at trial. Defendant called Clinical Psychologist Philip Trompetter in order, as he said in open court in the presence of the jury, "to establish that there is a motive for somebody placing that bullet jacket on the head of Kenny Stewart.[4] And that motive is that, that while, that I wish the future to decide that there was in the past a Beast in Revelations[5] and thereby in this time of, in modern times in this time of mechanizations, not lose their faith." Defendant further explained: "[M]y theory is that, that someone who would try to do this could make

---

[3]Following a hearing on his competency to stand trial, discussed below, defendant was found competent and permitted to discharge his attorney and represent himself.

[4]A small portion of bullet jacket was found matted in Stewart's hair and was later ballistically linked to the gun found in defendant's cabin.

[5]The "Beast in Revelations" is a reference to the Bible, book of Revelation 13:1-18, 17:8-18.

others extremely angry, including members of this jury, enough to try to kill me. My attempt is to show through a number of gentlemen of his qualifications that while they find me to be sane, on the other hand, it is their theory that anyone who tries to do this is insane, and I have succeeded in walking such a tight rope. It is my hope to show this jury that somebody who would successfully walk such a tight rope might well invoke others to try to frame him. It is my defense why I, I have a right to try to establish a motive for somebody placing that bullet jacket on the head of Kenny Stewart." Dr. Trompetter testified on direct examination, based on his prior interviews with defendant: "It was my view when you talked about issues such as the Beast that you were saying as a youngster, as an early teen you had decided that you were going to emulate the Beast from Revelations. That was somewhat of a life goal." Dr. Trompetter elaborated: "And it was your view that somehow by emulating the Beast in your life time that that would bring into being a situation whereby you would be able to decide whether in fact a God existed." Defendant interposed that Dr. Trompetter had not understood what he was trying to say and asked the witness whether he had formed an opinion as to whether defendant had been insane in the past. The trial court sustained the prosecutor's objection on grounds of relevancy, and defendant asked no further questions of Dr. Trompetter.

The parties stipulated that John Maurer, M.D., examined defendant on February 3, 1978, and Robert Slater, M.D., examined defendant on July 22, 1982. Dr. Maurer and Dr. Slater, both licensed psychiatrists, found defendant legally sane "notwithstanding that [defendant] discussed with [them] the subject of the Beast in Revelations" and that defendant "stated that he was actively trying to be known as the Beast in Revelations."

*Penalty phase*

1. *Prosecution evidence*

The prosecution presented evidence that defendant previously had suffered felony convictions for assault by means likely to cause great bodily injury, escape, possession of a completed check with the intent to defraud, burglary, being a felon in possession of a firearm, possession of a controlled substance, and perjury.

Additionally, the prosecution presented evidence of four instances in which defendant had engaged in assaultive conduct or had threatened violence.

Tracy Smith testified that, on the evening of August 19, 1986, he went to Gary's Drive-In to visit his then wife, who was working there. After she told

him about a man who had been "hanging around" the restaurant, Smith went outside to approach the man, later identified as defendant, who was sitting in a car. Smith asked him what he was doing there. Defendant told him to "Get away," showed him a knife, and said, "I'll cut you." The knife appeared to be a kitchen knife approximately 10 inches long. Smith returned to the restaurant, told his wife and her coworkers that defendant had threatened him, and phoned the police. Smith went back outside and again asked defendant what he was doing there; defendant threatened him again with the knife. Deputy Sheriff Allen Wayne Barcelona was called to the scene to investigate. Defendant, who was wearing towels tied onto his arms and around his crotch, explained he was waiting near the pay phone for a call about a job and that the knife and towels were for protection inasmuch as, a few days earlier, he had been attacked by persons wielding baseball bats.

On September 12, 1986, at a Savemart store on Paradise Road in Modesto, defendant refused store employees' requests to leave. Defendant had previously been warned not to enter the store because he had misused food stamps by buying small items, such as candy, and collecting the change. Savemart employee Robert Bowling warned defendant the police would be called if he did not depart. When defendant refused to leave, Bowling handcuffed him, called the police, and escorted defendant to an office. Defendant attempted to escape, trying to kick Bowling in the groin and ultimately kicking him in the face. When police arrived, Savemart employees turned defendant over to them.

On September 15, 1987, defendant was living at 1346 Harris in Stanislaus County. Michael Harris lived at 1347 Harris, two duplexes down from defendant. On that date, Harris was working on the fence separating his backyard from defendant's. A 10-foot section of the fence was down, allowing access to both yards. Harris's three-year-old son was playing with a little girl who lived next door to defendant; the children played back and forth in both yards. Defendant came out of his house and kicked the little boy in the side and the leg. The child fell down and cried. When Harris and his friend, Danny Wisner, went to the front of defendant's house to discuss the matter with him, defendant told Harris to keep his son out of his yard or he would do it again, and made a comment to the effect that he wanted the child to come in and "suck his dick" or asking whether Harris was teaching his son to "go around sucking guys' penises." During the conversation, defendant became angry and hit Wisner in the left eye with his fist. Harris and Wisner reported the incident to the sheriff's department and pressed charges against defendant. About a week later, after defendant had been released from custody, he threatened Harris and Wisner with a gun over the fence between the yards, saying they should not have done what they did to

him and, to Harris, "You better watch your son very, very carefully, and you better watch your family and your birds" (Harris raised pigeons in his yard). Thereafter, Harris and Wisner were fearful of testifying against defendant.

On March 23, 1989, defendant was in custody in the Stanislaus County Jail in cell No. X-12 on X-tier, which housed inmates charged with murder or other assaultive conduct. At that time, Brian Seabourn was housed at the other end of the same tier. Around 10:00 a.m. that day, Deputy Sheriff Daniel Chichester, who was assigned to the jail as a custodial officer, was working on X-tier doing the weekly cell search. On X-tier, an inmate whose cell was about to be searched would be removed and secured in the shower area, while two officers would search the cell, issue the inmate new bedding and clothing, and remove any contraband and weapons. When the search of Seabourn's cell was completed on that date, he was directed to come out of the shower and return to his cell. Instead of complying, Seabourn proceeded down the hallway to where Chichester was standing, approximately in front of defendant's cell, and hit Chichester under the jaw. Defendant was inside his cell. As Seabourn and Chichester exchanged blows, someone reached out and grabbed Chichester's rib cage and pulled him backward against the X-12 cell bars, striking his head. Chichester blacked out and was taken by ambulance to Scenic General Hospital, where he spent seven to eight days, two and a half to three of them in the intensive care unit. He had suffered a skull fracture and received 13 stitches to close head wounds. As of the time of trial, seven months after the incident, Chichester had not yet returned to work. He continued to suffer pain, dizziness, blurred vision, and ringing in his ears, and he faced possible neck surgery.

### 2. *Defense evidence*

Defendant called several Stanislaus County Sheriff's deputies to testify regarding their observations during the assault on Chichester in an effort to show that he had not been involved. Stanislaus County Sheriff's Officer Richard Wagner was working on X-tier at the time the fight erupted between Chichester and Seabourn. Wagner immediately went to Chichester's aid. As Wagner attempted to pull Seabourn off Chichester, Seabourn punched Wagner in the right eye, causing an injury that later required surgical repair. Stanislaus County Sheriff's Officer Darren Gharat served as liaison officer with Chichester and Wagner that morning on X-tier. When Gharat saw Seabourn strike the first blow at Chichester, he radioed for help, secured the crash gate and finally secured the floor. Neither Wagner nor Gharat saw defendant reach out of his cell to grab Chichester.

Stanislaus County Sheriff's Deputy Myron Larson investigated Seabourn's assault on Chichester. Larson found blood in front of and on the bars

of cell No. X-13, but none in front of or on the bars of cell No. X-12, defendant's cell. Larson found no direct evidence that defendant had pulled Chichester into the bars of cell No. X-12, but concluded defendant had done so, based on Chichester's description of events and the mark of a handprint on Chichester's right lower rib cage. According to Larson, if Chichester was fighting with Seabourn in front of cell No. X-12, the inmates in cell Nos. X-11 and X-13 would have been unable to make the handprint on Chichester's body.

Defendant presented the testimony of another Stanislaus County Sheriff's deputy to the effect that investigation had shown that defendant could not have made threatening phone calls, as reported by Michael Harris. Defendant called Michael Harris and Danny Wisner to testify further regarding the incident involving Harris's son, suggesting at various points that his kicking the boy was an appropriate response to the boy's having "felt [his] dick." Defendant also asked Harris and Wisner whether they were homosexuals and whether they lived together.

Defendant's father, Clyde Merle Lawley, testified on his behalf. Mr. Lawley was an inventor and the proprietor of a cattle food manufacturing business in Modesto. The Lawley family had moved to California from Oklahoma in 1950, when defendant was seven years old. Defendant was very intelligent but, in his father's view, extremely sick mentally, believing people were out to get him. He had never been able to hold a job for more than a few months. The family had tried to provide defendant appropriate guidance and financial assistance, including on one occasion buying him a car that he drove to Florida and abandoned in a swamp. Clyde Lawley had had many conversations over the years with defendant on such subjects as the colonization of outer space, cryogenics, history, religion, military science, and technology. Defendant and his father had an ongoing difference of opinion concerning defendant's attempt to go down in history as the Beast in Revelations; Clyde Lawley viewed this ambition as "absolutely" crazy. He wished defendant could begin facing reality rather than living in his imagination and fantasies.

Paul S. D. Berg, Ph.D., a licensed psychologist, testified he met with defendant on three occasions for a total of approximately eight to 10 hours. He conducted a number of standard psychological tests on defendant during these meetings, including the Raven Standard Progressive Matrices, the Bender-Gestalt and the Minnesota Multiphasic Personality Inventory. Defendant's intelligence quotient was 128, in the 97th percentile. Dr. Berg also reviewed correspondence from defendant's family, records from Atascadero State Hospital, a report by Dr. Philip Trompetter, the testimony of defendant's father, and other matters.

Dr. Berg testified defendant had been committed to Atascadero State Hospital from 1978 to 1982 as a result of an incident in which he pointed a shotgun at a deputy sheriff in Sonora. Defendant was evaluated at that time by Drs. Maurer and Powelson, both of whom diagnosed him as paranoid schizophrenic. (Dr. Powelson had found defendant legally insane, while Dr. Maurer disagreed.) Defendant was treated briefly with Haldol, an antipsychotic medication, while at Atascadero. He seemed to benefit from the programs in which he participated, at least to the extent he no longer discussed his stranger ideas, but he remained a loner with no close relationships to others. Dr. Berg diagnosed defendant as suffering from paranoid disorder, also known as delusional disorder, and antisocial personality disorder. He defined delusional disorder as "an illness of which the main quality is that [the affected person] develop[s] either one idea or a set of ideas . . . that are based on delusions and that those delusions influence how they think about everything, what they do, how they live." A delusion is a fixed, false idea. Defendant's delusion was his "idea about being or possibly being the Beast of Revelations." Defendant also had "very strong convictions about homosexuality, and homosexuals" and about Black people. Illustrative of defendant's antisocial personality disorder, Dr. Berg testified, were his extensive drug use and his long history of criminal behavior and convictions. Dr. Berg opined that defendant understood it is criminally wrong to shoot someone, but he was not always capable of conforming his conduct to the requirements of the law.

ANALYSIS

I. *Competency to stand trial*

A. *Factual background*

Defendant contends a variety of errors in the proceedings deprived him of a meaningful hearing on his competency to stand trial and thus of his state and federal constitutional rights to due process and a fair trial. The factual background necessary for an understanding of defendant's appellate claims follows.

1. *Events leading to institution of competency proceedings*

Defendant's case was set for trial before Judge Charles V. Stone on July 17, 1989. That morning, defendant's retained counsel, Ernest Kinney, reported that a disagreement had arisen concerning defendant's desire to waive a jury trial. Judge Stone advised defendant that he did not have a constitutional right to a nonjury trial, that counsel had the right to control the tactics

and strategy in the case, and that counsel did not want to waive a jury trial. Defendant informed Judge Stone that he disagreed with counsel over the type of jury to select: defendant did not want transvestites on the jury. Defendant told Judge Stone that all females in pants and men in dresses were transvestites.

Mr. Kinney said that, although he had agreed to take the case on a no-time-waiver basis, the issue of waiving a jury had come up only recently. Based on the facts of defendant's case, Kinney concluded he would not waive a jury. Defendant retorted that Kinney was lying and that he had told Kinney at their first meeting that he wanted a court trial. Defendant noted he had been "slandering" women who wear pants for many years and hoped they knew it, and thus felt a female jury would be prejudicial to his case. Defendant subsequently clarified that women "are terrific jurors" and he had a problem only with transvestites.

Judge Stone again advised defendant he could not waive a jury over counsel's objection. Defendant then said: "So that leaves me in a case, I can fire my attorney and not have adequate representation or take a chance that I may not be getting adequate representation at this moment because I've told him that I don't feel that he will get me a fair trial—I fear that he won't get me a fair trial by [a] jury of my peers." Judge Stone asked defendant what he wished to do. Defendant reiterated he wanted to waive the jury. Judge Stone asked, "Is there something else you want to say as far as being represented by Mr. Kinney is concerned?" Defendant responded: "I want a quick and speedy trial. I just got through telling you. I certainly cannot be prepared to handle this myself at the moment or I would certainly be willing to get rid of him. But I have zero preparation. I guess I have to go potluck then, but I object to my counsel, yes, sir." Judge Stone then ordered that a panel of 75 jurors be brought to the courtroom for jury selection.

That afternoon, outside the presence of the prospective jurors but with the prosecutor present, Kinney advised the court of another strategic dispute with defendant. Defendant wanted Kinney to subpoena "all the records" of California Department of Justice Criminalist William Jerry Chisum to determine whether Chisum had ever seen a bullet jacket separating from a bullet and remaining outside the wound. Defendant expressed disbelief that Chisum had ever seen a bullet separate from its casing and sought to impeach his testimony in that regard. When Kinney, who believed the effort would be a waste of time, refused to comply with defendant's request, defendant became upset, called him a liar, and stated he had no recourse but to represent himself. Without resolving the latter question, the court continued to conduct voir dire for the rest of the day.

The following morning, Kinney informed the court that defendant wished to represent himself, adding: "Because of the past mental situation of my client, being in Atascadero, because of his desire to have a court trial versus a jury trial, there has been a split in our theory and in our thinking and he does desire to go forward and represent himself. I would indicate to the court that based on his past record and some indications I have from Dr. Berg, there is a question in my mind whether he is competent to proceed to trial, and in particular, whether he is competent to stand as his own attorney. [¶] I would urge the court under [section] 1368 to appoint a doctor to have that evaluated. If he is found competent, then, of course, the court following the appropriate law, I believe, he could be his own counsel. I would request a [section] 1368 [examination] based on what I've told the court at this time."

After another outburst by defendant, Judge Stone declared he entertained a doubt as to defendant's competency to proceed to trial, suspended criminal proceedings, and appointed Clinical Psychologist Philip Trompetter to examine defendant.

### 2. *Experts' reports regarding defendant's competency*

Dr. Trompetter interviewed defendant at the Stanislaus County Jail for a total of two and one-half hours on July 21 and 23, 1989. He also reviewed the records of the Stanislaus County Sheriff's Department, defendant's records from the Stanislaus County Mental Health Department, and defendant's discharge summary from Atascadero State Hospital, and briefly contacted Detective Deckard of the Stanislaus County Sheriff's Department. Based on information gathered from these sources, Dr. Trompetter wrote and submitted a report in which he concluded defendant was competent to stand trial. Dr. Trompetter noted defendant had reported two prior psychiatric hospitalizations: a March 1978 commitment to Atascadero State Hospital, following a finding of not guilty by reason of insanity on a charge of assault with a deadly weapon on a peace officer, from which defendant was discharged in 1982; and, in January 1985, a 72-hour involuntary hospitalization at the Stanislaus County Department of Mental Health Psychiatric Health Facility. Both institutions reported a diagnosis of schizophrenia, paranoid type, but Dr. Trompetter noted that the reports he reviewed did not clearly specify the basis for the diagnosis and that some of the information he received actually undermined such a diagnosis.[6]

---

[6]For example, Dr. Trompetter noted that, although defendant had remained at Atascadero for more than four years, he was prescribed antipsychotic medications for less than six weeks.

In his July 21, 1989, examination of defendant, Dr. Trompetter found no clinical evidence of schizophrenia.[7] Defendant did, however, demonstrate many paranoid beliefs, which may have contributed to the diagnoses of schizophrenia. Dr. Trompetter described defendant as "a pridefully independent person who seems highly insulated," "very skeptical, cynical, and mistrustful of the motives of others, especially attorneys and women," and as having "a tendency to magnify minor details into proofs of treachery." Dr. Trompetter found defendant's beliefs about women possibly delusional: Defendant "claims that many women are transvestites or lesbians, and he seems to believe that their presence on a jury would heighten the likelihood that he will be convicted. He claims to not know a sure-fire way of being able to identify those females that are so inclined and, thus, he is led to conclude that he should have a Court trial. He reports to believe that all women who are lesbians and transvestites also molest children. While he adds that he 'may be wrong,' he maintains the belief with some degree of intensity."

"Seemingly connected to [defendant's] views regarding women," Dr. Trompetter found, "are some of his religious beliefs. He claims to have decided as a youngster to emulate the beast from Revelation in an attempt to assist him in deciding whether there was truly a God." Dr. Trompetter found it difficult to determine the extent to which defendant's religious beliefs reflected delusional thinking, as opposed to some fundamentalist religious faith.

In evaluating defendant's understanding of the proceedings against him, Dr. Trompetter found "a very sophisticated awareness of the charges and their seriousness. He can accurately define the role of the judge, jury, district attorney, and defense attorney. He knows and can describe the purpose of a

---

[7]"Aside from his discussions regarding women, the beast, in addition to his cynical attitudes regarding attorneys, the rest of his mental status revealed no psychotic impairments. He is precisely oriented to time, place, and person. His affect is normal and generally appropriate (at times he manifests inappropriate smiles when verbalizing hostile content). He demonstrates no loose associations, flight of ideas, thought pressure, or thought blocking. He denies any hallucinations presently or by history (except when under the influence of hallucinogens). He is able to concentrate and attend without difficulty. He demonstrates no impairment in immediate, recent, or remote memory. His intellectual functioning is above average. His judgment is grossly intact. The content of his thinking generally reveals nothing bizarre or grossly illogical. Outside of the over-valued ideas regarding the sexuality of many women, one cannot say with certainty that he experiences delusional thinking. Nonetheless, he does not demonstrate the essential features of schizophrenia in this interview, nor is the documentation reviewed for this evaluation convincing that he has ever demonstrated the essential features of schizophrenia. Without additional documentation from previous episodes, it is difficult to ascertain if he has been acutely schizophrenic in the past."

criminal proceeding and can define terms such as witness, testimony, and plea negotiation. He claims that he has no impairment in his memory that would preclude his ability to testify in his own behalf, if necessary. Similarly, he reports that he can assist in the cross-examination of prosecution witnesses if necessary. It is not necessarily predictable that he would be a management problem in the Courtroom, any more than his history of explosive and assaultive behavior would suggest. His manner and attitude during this examiner's evaluation indicates that he has the capacity to cooperate with defense counsel if he so chooses." In assessing defendant's preference for self-representation, Dr. Trompetter noted defendant acknowledged "running a risk by choosing to defend himself because of his lack of knowledge of the law, but seems willing to take this chance. While it does not appear to be a prudent decision, it is not motivated by a psychotic delusion."

Dr. Trompetter found less comprehensible defendant's preference for a court trial over a jury trial, informed as it appeared to be both by his possibly delusional beliefs regarding women and by his rationally articulated, albeit possibly incorrect, belief that the prosecution's evidence was unraveling and that a judge might more accurately than a jury assess a weak prosecution case. Dr. Trompetter stated: "The degree to which these findings compromise his competency to assist in his own defense is returned to the Court."

At defense counsel's request, licensed Psychologist Paul S. D. Berg, Ph.D., interviewed defendant for a substantial part of two days, on July 12 and 15, 1989, and evaluated records provided by counsel. Dr. Berg's letter-report to counsel diagnosed defendant as paranoid schizophrenic and concluded he was incompetent to stand trial. Dr. Berg found defendant's initial presentation to be that of a "somewhat phlegmatic, almost philosophical man, simply wrongfully accused but cynically and intellectually dealing with his feelings about that. [¶] An examination of his life, however, very quickly reveals that there is more than meets the eye, as seen, for example, in his earliest childhood experiences in which he developed as an alienated and schizoid-appearing individual and the onset of a specific delusional system by the time he was 12 years old, consistent with the rest of his life as a peripherally functioning and very marginal individual." Dr. Berg found defendant to be "so preoccupied with his mission against homosexuals that it totally distorts his own considerations and judgments about the existence or selection of a jury trial and his ability to cooperate with any counsel that would try to even advise him on such matters." Dr. Berg believed that "on some very real level [defendant] may also wish to be executed," although he did not directly admit it. Dr. Berg also believed "there is an underlying program in his life or script, so to speak, in which he has fantasied himself to be a soldier, and that he believes that if he were to be executed, he would

finally have achieved the kind of martyrdom that he cannot effect in any more conventional or somewhat less destructive way."

In addition to the diagnosis of schizophrenia, paranoid type, Dr. Berg noted the possibility of some secondary factors associated with an organic brain syndrome, which could not be confirmed due to defendant's resistance to the necessary examinations.

### 3. Trial on competency

On August 8, 1989, the competency hearing was held before Judge Frank S. Pierson. Dr. Trompetter's report and Dr. Berg's letter-report, summarized above, were received into evidence. Counsel waived the experts' presence and the right to cross-examination, and proceeded to argument.

Defense counsel argued Dr. Trompetter had not spent sufficient time with defendant to assemble a complete picture of him. Counsel argued further that defendant's concerns regarding transvestites and lesbians prevented him from either assisting counsel or representing himself, urging the court to find him incompetent.

The prosecutor argued, to the contrary, that Dr. Trompetter's report demonstrated that defendant possessed a sophisticated understanding of the nature of the proceedings and had some rational basis for preferring a court trial. Defendant's irrational beliefs concerning women and homosexuals, the prosecutor further argued, did not interfere with his understanding of the criminal process. The prosecutor pointed out that defendant was not an ignorant person and had often suggested lines of cross-examination to defense counsel and demonstrated knowledge of such subjects as ballistics. The prosecutor characterized the parties' differences as centering on tactical choices, such as self-representation or representation by counsel and trial by jury or trial by the court, and argued in conclusion that defendant was capable of making "rational, albeit maybe somewhat distorted" tactical decisions.

At the conclusion of the hearing, Judge Pierson found defendant "capable of understanding the nature and object of the proceedings against him and . . . capable of assisting counsel in his defense."

### B. Denial of due process resulting from lack of meaningful hearing on competency

Defendant urges that his competency trial suffered from so many procedural flaws as to have deprived him of his state and federal due process

rights and a fair trial. (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, §§ 7, 15.) Before addressing his specific claims of error, we review the basic legal principles governing competency to stand trial.

■ A person cannot be tried or adjudged to punishment while mentally incompetent. (§ 1367, subd. (a).) A defendant is mentally incompetent if, as a result of a mental disorder or developmental disability, he or she is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. (*Ibid.*) When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. (*People v. Stanley* (1995) 10 Cal.4th 764, 804 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *Pate v. Robinson* (1966) 383 U.S. 375, 377 [86 S.Ct. 836, 837-838, 15 L.Ed.2d 815].) "Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competence to stand trial." (*People v. Danielson* (1992) 3 Cal.4th 691, 726 [13 Cal.Rptr.2d 1, 838 P.2d 729], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].)

■ Although it arises in the context of a criminal trial, a competency hearing is a special proceeding, governed generally by the rules applicable to civil proceedings. (*People v. Skeirik* (1991) 229 Cal.App.3d 444, 455 [280 Cal.Rptr. 175].) The right to a jury determination of competency is statutory, however, not constitutional; thus, counsel may effectively waive it without a personal waiver from the defendant. (*People v. Masterson* (1994) 8 Cal.4th 965, 969, 972 [35 Cal.Rptr.2d 679, 884 P.2d 136]; see § 1369.) A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence. (§ 1369, subd. (f); *People v. Medina* (1990) 51 Cal.3d 870, 881-886 [274 Cal.Rptr. 849, 799 P.2d 1282].) On appeal, the reviewing court determines whether substantial evidence, viewed in the light most favorable to the verdict, supports the trial court's finding. (*People v. Marshall* (1997) 15 Cal.4th 1, 31 [61 Cal.Rptr.2d 84, 931 P.2d 262].) "Evidence is substantial if it is reasonable, credible and of solid value." (*Ibid.*)

■ Defendant contends the procedure followed in this case, i.e., submission of two written reports reaching opposite conclusions, did not constitute the full evidentiary hearing demanded by due process. Instead, he urges, the testimony of Dr. Trompetter and Dr. Berg should have been presented, subject to cross-examination by opposing counsel, along with documentary evidence of his past admissions to psychiatric facilities. A third expert's opinion also should have been presented as a "tie-breaker," defendant argues.

We disagree. In *People v. McPeters* (1992) 2 Cal.4th 1148 [9 Cal.Rptr.2d 834, 832 P.2d 146] (*McPeters*), rejecting a similar claim where the trial court

had employed a similar procedure in determining the defendant's competency, we noted: "Although defendant's counsel, for understandable reasons, elected to waive certain available incidents of the hearing procedure, i.e., the right to jury trial and the rights to present oral testimony and to confront and cross-examine witnesses, defendant presented evidence and received an independent judicial determination of his competence to stand trial based on the stipulated record." (*Id.* at p. 1169.)

Defendant attempts to distinguish *McPeters* on the basis that the trial court in that case appointed a third expert when the two previously appointed did not agree. (*McPeters, supra,* 2 Cal.4th at p. 1168.) In *McPeters,* however, one of the experts apparently was unable to reach a conclusion as to the defendant's competency. (*Ibid.* ["Dr. Davis observed defendant was hostile and uncooperative and expressed the view he was either feigning mental illness or suffering from a psychosis of undetermined etiology"].) Here, in contrast, both Dr. Trompetter and Dr. Berg made findings and reached conclusions, albeit opposing ones, concerning defendant's competency.[8] Contrary to defendant's argument, the trial court properly could assess the weight and persuasiveness of those findings and conclusions without having to resort to a third expert. " 'The chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion; . . . it does not lie in his mere expression of conclusion.' (Italics added.) [Citation.] In short, 'Expert evidence is really an argument of an expert to the court, and is valuable only in regard to the proof of the *facts* and the validity of the *reasons* advanced for the conclusions.' (Italics added.) [Citations.]" (*People v. Bassett* (1968) 69 Cal.2d 122, 141 [70 Cal.Rptr. 193, 443 P.2d 777].)

Defendant further contends that section 1369, subdivision (a) compelled the appointment of a second expert. In pertinent part, that statute provides: "In any case where the defendant or the defendant's counsel informs the

---

[8]We are aware that after attributing defendant's preference for a court trial to a mixture of rational and irrational beliefs, Dr. Trompetter stated: "The degree to which these findings compromise his competency to assist in his own defense is returned to the Court." Based on this statement, defendant labels Dr. Trompetter's conclusion regarding competency "equivocal and ambiguous," suggesting it must be deemed without weight. We disagree. Dr. Trompetter found defendant competent; he merely reserved to the court the final judgment as to the effect of defendant's possibly delusional belief system on his ability to assist in his defense. We do not find that Dr. Trompetter's reservation of judgment to the court on this single aspect of defendant's competency undermines the value of his reasoning and conclusion. By analogy, a defendant who expressed a preference for a court trial unless he could exclude all Capricorns from the jury, in the belief that Capricorns would render harsher judgments, but who evinced no other signs of irrationality, correctly would be deemed competent to stand trial.

court that the defendant is not seeking a finding of mental incompetence, the court shall appoint *two*" mental health experts. (*Ibid.*, italics added.) While implicitly acknowledging that neither he nor his counsel ever expressly so informed the court, defendant argues Judge Stone in fact was informed defendant was not seeking a finding of incompetence by virtue of his insistence on a court trial, a new lawyer, or the right to proceed in propria persona. Putting aside the absence from the record of any explicit acknowledgment by Judge Stone that he knew defendant was not seeking a finding of incompetence, we believe defendant misreads the statute. Section 1369, subdivision (a) plainly requires "defendant or the defendant's counsel" to "inform[] the court" that the defense is not seeking a finding of incompetence in order to trigger the required appointment of a second mental health expert. ██ ██ Defendant cites no case authority supporting his interpretation of the statute.[9]

Defendant further contends the competency hearing should have been held before Judge Stone, who had observed defendant in court, heard his explanation of why he did not want lesbians and transvestites on his jury, and declared a doubt regarding his competency. Defendant acknowledges we have held that a competency hearing need not be held before the judge who initiated the proceeding by declaring a doubt. (*People v. Hill* (1967) 67 Cal.2d 105, 113, fn. 2 [60 Cal.Rptr. 234, 429 P.2d 586].) Nevertheless, he urges that, under the totality of the circumstances of the present case, holding the competency hearing before Judge Pierson denied him due process because only Judge Stone had the "experiential perspective" to appreciate the findings of Dr. Trompetter and Dr. Berg. We disagree. ██ Competency proceedings commonly are assigned for hearing to a judge different from the one who initiated them by declaring a doubt (see *Waldon v. Superior Court* (1987) 196 Cal.App.3d 809, 813 [241 Cal.Rptr. 123]), and we are confident in the ability of our state's trial judges to preside over such

---

[9]Defendant contends trial counsel rendered ineffective assistance in failing to inform the court that defendant was not seeking a finding of incompetence. To succeed in a claim of ineffective assistance of counsel, defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that, but for counsel's error, the outcome of the proceeding, to a reasonable probability, would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 [104 S.Ct. 2052, 2064, 2067-2068, 80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839].) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, the claim on appeal must be rejected unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) Here, the record fails to eliminate the possibility that counsel reasonably concluded the appointment of another mental health expert would not benefit defendant; consequently, defendant's claim must fail for purposes of this appeal.

hearings whether or not they have some prior personal experience of a defendant's in-court behavior.[10]

Defendant also contends he had a liberty interest, under the Fourteenth Amendment to the United States Constitution, in the statutory right to jury trial on the question of his competency and thus that the judgment must be reversed in the absence of a knowing, intelligent and voluntary waiver thereof. (See *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346-347 [100 S.Ct. 2227, 2229-2230, 65 L.Ed.2d 175].) ▇ In *People v. Masterson, supra,* 8 Cal.4th at page 972, however, we rejected the argument that the trial court was required to advise the defendant of his right to a jury determination of his competency, given the lack of a constitutional foundation for the right. From that premise it follows the trial court here did not err in failing to secure defendant's waiver of a jury. Defendant attempts to distinguish *People v. Masterson* on the basis that the defendant's attorney in that case stipulated to an 11-person jury, while in this case the question evidently was not raised on the record. We find the distinction unpersuasive and will not presume defendant's attorney was unaware of the availability of a jury. (Cf. *Strickland v. Washington, supra,* 466 U.S. at p. 689 [104 S.Ct. at p. 2065]; *People v. Hart* (1999) 20 Cal.4th 546, 624-625 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Anderson* (1979) 97 Cal.App.3d 419, 426 [158 Cal.Rptr. 727].)

Defendant contends Judge Pierson's reliance on Dr. Trompetter's report, in finding defendant competent, violated due process in that the report was "ambiguous" on the question whether defendant could rationally assist defense counsel. Defendant further asserts Dr. Trompetter's conclusion that he was competent was inconsistent with findings from his examination and thus required inquiry and clarification from the court. Because defendant's contentions, at bottom, read certain remarks contained in Dr. Trompetter's report out of context, we disagree. As the Attorney General observes, Dr. Trompetter's reservation concerning defendant's ability to assist defense counsel rationally was limited to the matter of defendant's preference for a court trial over a jury trial, which Dr. Trompetter found derived from a mixture of rational tactical reasons and paranoid beliefs regarding lesbians and transvestites. The latter, Dr. Trompetter found, "interfer[ed]" with defendant's ability rationally to choose the better alternative, but Dr. Trompetter

---

[10]Defendant asserts he objected to Judge Pierson's presiding over the competency hearing, implicitly arguing this circumstance supports a finding of error. His premise, however, is mistaken: Although defendant professed not to understand why his competency hearing was assigned to Judge Pierson, Judge Stone had previously informed him that the proceeding might be heard by another judge. Defendant registered no objection.

clearly did not conclude defendant was incapable of rationally assisting defense counsel. To the contrary, he found that defendant's manner and attitude during the evaluation indicated he had "the capacity to cooperate with defense counsel if he so cho[se]." As noted, Dr. Trompetter found defendant possessed a sophisticated understanding of the charges and their seriousness and of the roles of court and counsel; the content of his thinking contained nothing bizarre or grossly illogical; his intelligence was above average and he could concentrate and attend without difficulty; and he currently showed none of the symptoms of schizophrenia. ■ In sum, Dr. Trompetter's findings supported his conclusion that defendant was competent, and, contrary to defendant's contention, the length of his interviews with defendant (a total of two and one-half hours) does not undermine the validity of his findings. (See *People v. Stanley, supra,* 10 Cal.4th at pp. 811-812 [competency evidence of two medical experts who each spent "about one hour" with defendant deemed sufficient].)

C. *Claimed error in trial court's finding of competency*

Defendant contends, based on the claims of error urged in the preceding part, that Judge Pierson's finding of competency was not founded on substantial evidence. In the preceding part, we rejected those claims of error, as well as defendant's assertion that Dr. Trompetter's opinion was fatally ambiguous and entitled to little weight; to rehearse the substance of that opinion is unnecessary. We therefore reject defendant's claim that Judge Pierson erred in finding him competent.

D. *Denial of effective assistance of counsel at competency hearing*

Defendant argues trial counsel Kinney rendered ineffective assistance, in violation of state and federal constitutional guarantees (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 14), during the competency hearing in six respects. First, he claims counsel should have recognized that under section 1369 two experts should have been appointed to evaluate defendant's competency. Second, he claims counsel should have objected to Judge Pierson's presiding over the hearing, rather than Judge Stone. Third, he contends counsel should have insisted on having the matter tried before a jury. Fourth, even without a jury, defendant contends counsel should have insisted on a full evidentiary hearing that, at a minimum, would have included examination of Dr. Trompetter and Dr. Berg and the introduction of the extensive documentary history of defendant's mental illness. Fifth, given the contradictory conclusions of Dr. Trompetter and Dr. Berg, defendant contends counsel should have insisted that a second expert be appointed to evaluate defendant. Sixth, defendant contends counsel should have sought

dismissal of the information because defendant was not competent at the preliminary hearing.

Even assuming for argument's sake that a competent attorney would have taken the actions defendant suggests, he fails to meet his burden of establishing, as a demonstrable reality, the prejudice requisite to a meritorious claim of ineffective assistance of counsel. (See *People v. Williams* (1988) 44 Cal.3d 883, 937 [245 Cal.Rptr. 336, 751 P.2d 395].) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland v. Washington, supra,* 466 U.S. at p. 697 [104 S.Ct. at p. 2069].) On this record, which amply supports the determination defendant was competent to stand trial, we cannot say a more favorable outcome was reasonably probable had counsel sought the appointment of a second expert, insisted on a jury trial, moved to have Judge Stone preside over the competency hearing, demanded a fuller evidentiary hearing, or moved to dismiss the information.

### E. *Trial court's subsequent failure during guilt and penalty phases to declare a doubt regarding defendant's competency*

■ When, at any time prior to judgment, a trial court is presented with substantial evidence of a defendant's incompetence to stand trial, due process requires a full competency hearing. (*People v. Danielson, supra,* 3 Cal.4th at p. 726.) " 'When a competency hearing has already been held and defendant has been found competent to stand trial, however, a trial court need not suspend proceedings to conduct a second competency hearing unless it "is presented with a substantial change of circumstances or with new evidence" casting a serious doubt on the validity of that finding.' " (*People v. Kelly* (1992) 1 Cal.4th 495, 542 [3 Cal.Rptr.2d 677, 822 P.2d 385].) A trial court may appropriately take into account its own observations in determining whether the defendant's mental state has significantly changed during the course of trial. (*People v. Jones* (1991) 53 Cal.3d 1115, 1153 [282 Cal.Rptr. 465, 811 P.2d 757].)

Defendant contends that, despite Judge Pierson's ruling that he was competent to stand trial, Judge Eugene M. Azevedo, who presided at trial, was required to conduct a second competency hearing as a result of the accumulation of evidence during the guilt and penalty phases of trial casting serious doubt on the validity of the prior finding of competency. In support, defendant recites in great detail instances of his alleged incompetence. On examination, however, each such instance appears either to manifest the same arguably delusional beliefs reported by Dr. Berg and Dr. Trompetter in

their competency evaluations[11] or to reflect the ineptitude frequently exhibited by self-represented defendants.[12] In short, the record fails to establish

---

[11]Thus, for example, defendant sought to conduct individual voir dire in chambers to determine if prospective jurors were homosexual. When Judge Azevedo expressed doubt that such inquiry was permissible and asked how homosexuality was relevant to the case, defendant answered: "Well, if you will excuse me, Your Honor, females have the same problems as men, if a man is wearing a dress, this is woman. Homosexuals have dressed as men for many years until recently and they rammed it through school and fixed it so—I am not being concise, I'm sorry." "A man wearing a dress is a transvestite. A woman in pants is a transvestite. And the evidence is very, very, very strong, Your Honor, that the homosexual women did wear pants and did dress as men prior to the women's movement fixing it so that, and very quickly having all their daughters from birth wearing pants, that these are transvestites, Your Honor." "I don't want a transvestite on my jury, and I certainly don't want somebody that I advocate war against, against judging me." Later, defendant proposed to feign homosexuality during voir dire, explaining that by pretending to be homosexual he would render the prospective jurors "freer to express their belief, and if in their attempt, they will be more voluntary of their bias, and then at the end of it I will tell them that I am all those things that, those that I were to ask for cause, that I am all those things that they have stated that they oppose and do have biases against." Judge Azevedo said, "I don't quite follow you." Defendant explained he would ask questions in a leading manner, which would lead jurors to believe he was "queer [or] gay" and "allow them to answer if the questions are backwards, as a matter of fact." After further probing defendant's concerns, the court permitted defendant to include in the jury questionnaire a question asking prospective jurors to "State your feelings regarding those persons who are militantly opposed to homosexuals, lesbians and transvestites."

Another prominent theme in defendant's voir dire was his effort to be recognized as the Beast in Revelations. Thus, for example, defendant directed the following question to Prospective Juror Be.: "Testimony will be given during this trial during the defense for motive to frame me that I have tried for a number of years to go down in history as a Beast in Revelations. Not saying that I am. I have tried to go into history as the Beast in Revelations, would my having done so prejudice you against me in this case?" And defendant engaged in the following dialogue with Prospective Juror Bl.: "Mrs. [Bl.], the defense will produce witnesses that state that I have for a number of years attempted to go down in history as a Beast in Revelations. Would somebody who would try to go down in history as the Beast in Revelations, would you believe that they must be an evil person?" Prospective Juror Bl. answered: "I don't know. I don't know what you mean." Defendant persisted: "If somebody were attempting to, not saying, I make no pretense and never have made pretense of being godsend [God sent] to doing anything. If somebody were trying to be recognized in history as a biblical character to have this part of history viewed as coming to pass, would you say that a person who would try to do that was evil? The Beast in Revelations, there are many conceptions of whether he is evil or not. Would you think he was evil?" The prospective juror did not know what defendant was talking about, but did not believe it would affect her decision on defendant's guilt.

[12]Thus, defendant quotes at length from his guilt phase closing argument, labeling it "a rambling mish-mash of points with no coherent theme." He also quotes his penalty phase opening statement in its entirety: "The D.A., the D.A. wants the death penalty, and I can't see that I am much concerned. You want to put me away for natural life or death. Neither way is too much to look forward to. If you want—I am disappointed in you as jurors. I didn't think they had any evidence. I don't got no more to say."

Defendant further cites his calling Dr. Trompetter as a witness to establish "a motive for somebody placing that bullet jacket on the head of Kenny Stewart. And that motive is that,

any change of circumstances or new evidence casting doubt on the prior finding of competency. Judge Azevedo, moreover, in denying defendant's motion for new trial on the ground he was tried while incompetent, stated that defendant "didn't show me that he or in [any way] that he was suffering from any kind of a mental disease or mental condition that [a]ffected his ability to represent his own best interests."[13]

---

that while, that I wish the future to decide that there was in the past a Beast in Revelations and thereby in this time of, in modern times in this time of mechanizations, not lose their faith." Defendant elaborated that his "theory is that, that someone who would try to do this could make others extremely angry, including members of this jury, enough to try to kill me. My attempt is to show through a number of gentlemen of his qualifications that while they find me to be sane, on the other hand, it is their theory that anyone who tries to do this is insane, and I have succeeded in walking such a tight rope. It is my hope to show this jury that somebody who would successfully walk such a tight rope might well invoke others to try to frame him. It is my defense why I, I have a right to try to establish a motive for somebody placing that bullet jacket on the head of Kenny Stewart."

Defendant also cites as evidence of incompetency his penalty phase closing argument, which largely concerned evidence presented at the guilt phase.

[13]At the hearing on defendant's motion for new trial, Judge Azevedo remarked: "At no time thereafter [following Judge Pierson's finding of competency] was the issue of competency ever brought to the attention of the court, either by the defendant, his advisory counsel or—or anyone else. [¶] I should also note for the record and the record speaks for itself, really, but I personally saw Mr. Lawley every single day during the total—and more, actually, during the total seven weeks that this matter took to try, including the jury selection. And even more times than that because you have all the pretrial motions that we spent substantial time on. And there were matters that the jury did not hear in between the conclusion of the guilt phase and the beginning of the penalty phase. [¶] During all of this time I observed Mr. Lawley here in court, how he conducted himself. In my judgment, considering the evidence involved in the case, he did a very good job in representing himself and he certainly at no time in my opinion exhibited to me any kind of an indication that would have alerted the court to make [its] own individual determination that he was in [any way] unable to represent himself. He conducted himself with dignity. He conducted himself with a great deal of knowledge as to what he could and could not do. I think representing himself as far as this court is concerned he certainly didn't show me that he or in [any way] that he was suffering from any kind of a mental disease or mental condition that [a]ffected his ability to represent his own best interests. [¶] He may have made some—some bad judgments on some evidence that he wanted to present, but then that's—that's what the court's for is to rule on the admissibility of any evidence presented to the court. I granted a lot of—I mean I denied a lot of his requests or objections and I granted a fair amount of them. [¶] Certainly nothing that he did indicates to me that he was in [any way] suffering from any mental problem that prohibited in [any way] his representation of himself, which of course he chose personally to do."

Thereafter, in denying defendant's motion for new trial, Judge Azevedo stated: "To my knowledge there never was any other suggestion by any court official in this case that the defendant during either the guilt phase or the penalty phase was unable to assist in his defense or was exhibiting any kind of mental conduct that would have justified an additional or new 1368 proceedings or in any way gave any indication to this court that the defendant was not competent to represent himself, despite counsel's affidavit to the contrary that he now feels, by that I mean Mr. Winston feels that at no time was Mr. Lawley competent to proceed with the case."

True, defendant's speech and demeanor at one point during his penalty phase closing argument moved the prosecutor to request that he be examined for signs of being under the influence of controlled substances. Contrary to defendant's argument, such request (which eventuated in a negative finding) was not the equivalent of a declaration of doubt as to defendant's competency within the meaning of section 1367.[14] We see no basis on the present record to conclude Judge Azevedo erred in failing to conduct a second competency hearing. (See *People v. Danielson, supra,* 3 Cal.4th at p. 727 [trial court's decision that a competency hearing is unnecessary is entitled to great deference on appeal].)

## II. *Self-representation and related issues*

### A. *Defendant's competency to act as his own attorney*

After resolution of the proceedings under section 1369 with a finding that defendant was competent to stand trial, Judge Hugh Rose III heard and granted defendant's motion for self-representation under *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562].[15] Defendant contends he was incompetent to act as his own attorney and that, in granting his motion, Judge Rose effectively denied him his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, thereby committing reversible error.

■ The requirements for a valid waiver of the right to counsel are (1) a determination that the accused is competent to waive the right, i.e., he or she has the mental capacity to understand the nature and object of the proceedings against him or her; and (2) a finding that the waiver is knowing and voluntary, i.e., the accused understands the significance and consequences of the decision and makes it without coercion. (*Godinez v. Moran* (1993) 509 U.S. 389, 400-401 & fn.12 [113 S.Ct. 2680, 2687, 125 L.Ed.2d 321]; *People v. Robinson* (1997) 56 Cal.App.4th 363, 372 [65 Cal.Rptr.2d 406].)

---

[14]The trial court later noted for the record: "At some point this morning, . . . a request was made by the People for [a Health and Safety Code section] 11550 examination of the Defendant to determine whether or not he had in[g]ested any kind of controlled substance this morning. Due to some concern over his, I think you phrased it in terms of his speech and expression. My bailiff did perform that examination at the conclusion of the break this morning and reported to me that it appeared at least to him anyway, that the Defendant did not appear to be under the influence of any kind of drug." The bailiff affirmed that to be the case. The prosecutor added, for the record: ". . . Your Honor, . . . your bailiff, Rick Erwin, has spent considerable amount of time in drug investigations and to my knowledge is qualified as an expert in the field of drug intoxication or influence, I should say." The court acknowledged that to be true.

[15]For clarity: Judge Charles V. Stone presided over certain pretrial proceedings and instituted competency proceedings; Judge Frank S. Pierson presided over the competency hearing; Judge Hugh Rose III heard defendant's *Faretta* motion; and Judge Eugene M. Azevedo presided over defendant's trial.

Defendant's argument centers on his claim that his waiver of counsel was involuntary in light of the attendant circumstances. First, he urges his waiver was involuntary and not unequivocal because he in fact wished to be represented by counsel, but the trial court told him none would be found (given his refusal to waive his speedy trial right). Second, he argues the trial court inadequately admonished him about the dangers of self-representation. Third, he contends he waived counsel only on the understanding that he would have access to legal materials necessary to aid in his defense, and their unavailability rendered his waiver involuntary. Fourth and finally, he contends Advisory Counsel Robert Winston's unpreparedness at the penalty phase rendered his waiver involuntary. Examination of the record establishes defendant's claim, in all its aspects, lacks merit.

First, the record does not substantiate defendant's contention that he in fact wished to be represented by counsel but was coerced into self-representation. Defendant emphatically and repeatedly sought to dismiss his retained counsel and represent himself. As the Attorney General observes, the circumstance that defendant offered to accept advisory counsel in lieu of appointed counsel so that he would not have to waive time undermines his claim of coercion.

With regard to defendant's second contention, we agree that as well as determining that a defendant who seeks to waive counsel is competent, the trial court, by making the defendant aware of the risks of self-representation, must satisfy itself that the waiver is knowing and voluntary. (*Godinez v. Moran, supra,* 509 U.S. at p. 400 [113 S.Ct. at p. 2687]; *People v. Bloom* (1989) 48 Cal.3d 1194, 1224 [259 Cal.Rptr. 669, 774 P.2d 698].) No particular form of words, however, is required in admonishing a defendant who seeks to forgo the right to counsel and engage in self-representation. " 'The test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case.' " (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1048 [17 Cal.Rptr.2d 174, 846 P.2d 756], revd. on other grounds *sub nom. Stansbury v. California* (1994) 511 U.S. 318 [114 S.Ct. 1526, 128 L.Ed.2d 293], quoting *People v. Bloom, supra,* at p. 1225.) Defendant complains Judge Rose did not sufficiently explore whether defendant "truly appreciated the enormity of the charges facing him and the task he faced in representing himself." Specifically, defendant complains Judge Rose made no effort to explain in any detail what "rules" and "procedures" he expected defendant to follow; did not mention that defendant was facing the death penalty until after granting the *Faretta* motion; did not explain that defendant might face a second, penalty phase of trial; and did not identify

the dangers and disadvantages of self-representation except to point out that the prosecutor was a very skilled, highly experienced attorney.

Review of the record reveals the following colloquy: "THE COURT: Do you understand that if you are representing yourself that you will receive no special treatment by the Court, that you must follow all the technical rules of evidence and procedure and the substantive law in making objections and motions, and so forth, the same rules will apply to you as will apply if you had a lawyer represent you? Do you understand that? [¶] THE DEFENDANT: Yes, I am aware of that, Your Honor. [¶] THE COURT: Do you understand that the prosecution is being run by a very skilled attorney who has many years of experience in the practice of the law and that you will be not given any further consideration because of the fact that you don't have his skill and training in the representation of criminal defendants? [¶] THE DEFENDANT: I am aware of that, Your Honor. [¶] THE COURT: You are not going to receive any greater library privileges than any other pro per defendant and you will receive no extra time for preparation, you will have no staff of investigators at your beck and call. Do you understand that?" It was then noted for the record that a defense investigator had already been retained and defendant would be provided with the investigator's findings. The court continued: "You can read and write, I assume? [¶] THE DEFENDANT: Yes, sir. [¶] THE COURT: If there is any kind of disruption or misbehavior at the time of trial your right of self-representation could be vacated at that point. [¶] THE DEFENDANT: I wasn't aware of that, but I accept that as true. [¶] THE COURT: And if you, in spite of your best—or worst—efforts in representing yourself, if you were at some point convicted, you can't claim later on that you were inadequately represented by counsel. [¶] THE DEFENDANT: I read that in the law, Your Honor. [¶] THE COURT: Mr. Brazelton [the prosecutor], do you have any further comments? [¶] MR. BRAZELTON: No, Your Honor. [¶] THE COURT: Mr. Kinney, we'll relieve you. Thank you, sir."

Three days later, when the matter was next on calendar, with defendant and the prosecutor present before the court, the following colloquy transpired: "THE COURT: Mr. Lawley, Mr. Winston and the Court and my administrator have had some discussion about his representation of you in this matter as at least associate counsel or assistant counsel in this matter. What is your desire in this matter, Mr. Lawley? [¶] THE DEFENDANT: I would be happy to have him as assistant counsel, Your Honor. [¶] MR. BRAZELTON: Excuse me, Your Honor. Is—I believe the proper— [¶] THE COURT: Advisory. [¶] MR. BRAZELTON: —term is 'advisory.' [¶] THE COURT: Advisory counsel. You don't want him to represent you formally? [¶] THE DEFENDANT: No. [¶] THE COURT: You still want to represent yourself? [¶] THE DEFENDANT: Yes, I am. [¶] THE COURT: You're still

aware of all the things I said before and, in addition, you are aware the maximum penalty of death if things go badly for you? [¶] THE DEFENDANT: Yes, Your Honor." After admonishing defendant that he, not advisory counsel, would control the defense and obtaining defendant's assent, Judge Rose appointed Attorney Robert Winston as advisory counsel.

Defendant complains that Judge Rose failed to explain in any detail what rules and procedures he expected him to follow, failed to mention that defendant was facing the death penalty until after he granted the *Faretta* motion, and failed to tell him there might be a second phase of trial to determine penalty. We disagree. Judge Rose's remarks, taken together, adequately admonished defendant of the risks of self-representation. (*People v. Lopez* (1977) 71 Cal.App.3d 568, 572-574 [138 Cal.Rptr. 36] [recommending virtually identical set of admonitions].) The record suggests no confusion on defendant's part regarding the meaning of the admonitions, risks of self-representation, or the complexities of his case, much less that his election to represent himself was other than voluntary. Defendant, moreover, was found by Dr. Trompetter to possess "a very sophisticated awareness of the charges and their seriousness" and himself acknowledged he had "been through about six trials" and had "an understanding of trials." On this record, his claim of inadequate admonishment must fail.

With respect to defendant's contention that the unavailability of necessary legal materials vitiated his waiver of counsel, we reject (*post*, at p. 146) his related claim that the trial court erred in failing to inquire into the adequacy of the resources available to him as a self-represented defendant. Because defendant fails to establish the underlying premise of these claims, i.e., the actual inadequacy of available resources, the contention fails to cast doubt on the validity of his waiver.

Finally, we reject defendant's contention that Advisory Counsel Winston's alleged unreadiness to assume appointed counsel status at the penalty phase vitiated his waiver of counsel. In granting defendant's motion for self-representation, Judge Rose admonished him he was "in the driver's seat," that Winston had no power to address the jury, make objections on defendant's behalf, or speak to the court, and would only be permitted to give defendant advice. Having been advised of and having accepted these restrictions on advisory counsel's role, defendant cannot now complain that his waiver of counsel and concomitant assumption of responsibility for his own defense were involuntary. As the Attorney General suggests, defendant was not entitled both to represent himself and to receive the benefit of professional representation. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1368 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

B. *Advisory counsel's alleged conflict of interest; alleged coercion of defendant into accepting advisory counsel despite conflict*

Defendant contends his advisory counsel, Robert Winston, labored under a conflict of interest stemming from his representation of prosecution witness Treva Coonce; defendant never waived the conflict, he further contends, but was coerced into accepting Winston as advisory counsel by virtue of the trial court's professed inability to find other advisory counsel for him under the circumstance that defendant refused to waive time. The conflict, defendant asserts, denied him due process, his Sixth Amendment right to the assistance of counsel, his right to a fair and reliable verdict under the Eighth Amendment, and his rights under parallel state constitutional provisions. We note that because there is no constitutional right to advisory counsel (see *post*, at p. 145), defendant's claim must arise under the due process clause.

Resolution of this issue requires a fairly extended recitation of the factual circumstances. Attorney Winston represented defendant on a charge of murdering Kenneth Stewart, with a kidnapping special-circumstance allegation, from February 8, 1989, to the dismissal of the charges in April 1989. When the case was refiled, on May 1, 1989, defendant was represented by Ernest Kinney. On August 14, 1989, following the trial court's finding him competent to stand trial, defendant moved to dismiss Kinney and represent himself with the help of advisory counsel. At the same time, he told the court he did not want his trial postponed further and would not waive time. After warning defendant of the slim chance of finding an attorney to assist him without a waiver of time, and admonishing him of the dangers of self-representation, the court granted his request to proceed in propria persona and relieved Kinney as counsel. On August 17, 1989, the court appointed Winston as advisory counsel.

On August 25, 1989, the prosecution notified the court of a possible conflict of interest in Winston's service as advisory counsel, in that on July 25, 1989, Winston had undertaken the representation of prosecution witness Treva Coonce in several factually unrelated cases. According to the prosecution, the disposition of Coonce's cases depended on her truthful testimony in defendant's trial. After a private discussion with defendant, Winston explained on the record the circumstances of his representation of Coonce as follows: The municipal court had requested him to represent Coonce on two felony and three misdemeanor matters, all factually unrelated to defendant's case. Winston had accepted the appointment and met Coonce in court, introduced himself to her, and told her they would talk at a later time. Before they ever discussed her cases, Coonce became seriously ill, was admitted to

a hospital, and was not expected to recover. When Winston thereafter was appointed as defendant's advisory counsel, he recognized a "problem" in connection with his representation of Coonce, but he did not regard the problem as an actual conflict because he had never discussed her cases or any other case with Coonce. He appeared in municipal court the day after his appointment as defendant's advisory counsel, intending to "conflict out" on Coonce's cases, only to discover the district attorney's office had already dismissed four of the five cases filed against her. Winston informed the prosecutor handling the fifth case, a Mr. McKenna, of the disposition of the other four; McKenna immediately dismissed the fifth case. Winston understood the reason for the dismissals was the county's desire to avoid responsibility for the cost of the medical and surgical treatment Coonce required to save her life. Winston further advised the court that he understood Coonce was not expected to live, and that if she did survive, she was likely to have suffered brain damage and severe disability and would be unable to testify in defendant's case. Winston was never informed of any immunity agreement between Coonce and the district attorney's office pertaining to defendant's capital case until the day the prosecution raised the issue of the potential conflict.

The prosecutor then represented to the court and the defense that Coonce in fact had recovered more fully than had been anticipated and likely would be able to take the stand by the time her testimony was needed. The prosecutor expressed concern that Coonce had not waived any conflict arising from the prior representation. Defendant then declared he was not waiving any conflict. He further insisted he was not waiving time in order to find new advisory counsel.

In view of the seriousness of the case and the potential conflict of interest, the trial court then discharged Winston as advisory counsel.

On August 29, 1989, Winston moved the trial court to reconsider its ruling. He reiterated he had never received confidential communications from Coonce, the cases on which he was appointed to represent her were factually unrelated to defendant's capital case, and the only documents he received in her cases—police reports—were available to any member of the public who cared to review the files. He explained: "I feel no compunction or influence that would keep me from being an aggressive advisory counsel to Mr. Lawley. I certainly wouldn't pull any punches and my relationship, such as it was with Ms. Coonce, would not affect my representation or advisory representation to Mr. Lawley in any manner whatsoever." Winston

stated that, during his initial representation of defendant, he recalled receiving no police reports or other documents even mentioning Coonce.[16] He acknowledged he would not undertake any future representation of Coonce and would resist any attempt to reappoint him to her cases, should they be revived. Winston also acknowledged that assisting defendant in thoroughly and actively cross-examining Coonce would be "part of the job" of advisory counsel, and that if Coonce lied on the stand and was subsequently recharged with a felony, such a scenario would not affect his ability to serve defendant.

In response to inquiry by the trial court, defendant stated he could not judge whether Winston had a conflict, and was not waiving any conflict. The prosecutor opposed Winston's reappointment as advisory counsel, citing *People v. Easley* (1988) 46 Cal.3d 712 [250 Cal.Rptr. 855, 759 P.2d 490], in which a death sentence was reversed due to defense counsel's conflict of interest in simultaneously representing a prosecution witness in a civil lawsuit arising out of the same incident (an alleged arson) that formed the basis of the prosecution's penalty phase case.

Based on all the circumstances, the trial court concluded Winston had no conflict in representing defendant in an advisory capacity. Consequently, the court reappointed Winston as advisory counsel nunc pro tunc, and Winston served in that capacity for the remainder of the trial.[17]

 Although, as the Attorney General notes, a self-represented defendant has no constitutional right to the appointment of advisory counsel (e.g., *People v. Bradford, supra,* 15 Cal.4th at p. 1368), when such counsel is appointed the defendant is entitled to expect professionally competent assistance within the narrow scope of advisory counsel's proper role (see *People v. Hamilton* (1989) 48 Cal.3d 1142, 1164, fn. 14 [259 Cal.Rptr. 701, 774 P.2d 730]). Professionally competent assistance comprises assistance unaffected by conflict of interest. (*Wood v. Georgia* (1981) 450 U.S. 261, 271 [101 S.Ct. 1097, 1103, 67 L.Ed.2d 220]; see *People v. Easley, supra,* 46 Cal.3d at p. 724.) "When the trial court knows, or reasonably should know, of the possibility of a conflict of interest on the part of defense counsel, it is required to make inquiry into the matter." (*People v. Bonin* (1989) 47 Cal.3d 808, 836 [254 Cal.Rptr. 298, 765 P.2d 460].) The court, upon inquiring, may

---

[16]The prosecutor acknowledged that Coonce had not testified at the first preliminary hearing, at which Winston had represented defendant.

[17]On August 30, 1989, the prosecution requested reconsideration of Winston's reappointment as advisory counsel, citing his municipal court billings for his representation of Treva Coonce, which suggested he had spent more time on her cases than he had previously acknowledged. Winston stated the billings were erroneously duplicative and he would so advise the municipal court. The trial court denied the prosecution's request for reconsideration.

decline to relieve counsel if it determines the risk of a conflict is too remote. (*Id.* at pp. 836-837, citing *Holloway v. Arkansas* (1978) 435 U.S. 475, 484 [98 S.Ct. 1173, 1178-1179, 55 L.Ed.2d 426].) In making its determination, the court may rely on the representations of defense counsel that no conflict exists. (*U.S. v. Crespo de Llano* (9th Cir. 1987) 838 F.2d 1006, 1012.) To obtain relief on appeal, the defendant must establish the existence of an actual conflict that adversely affected counsel's performance. (*People v. Bonin, supra,* at pp. 837-838.)

 In the present case, the trial court found no conflict existed, presumably based on Winston's representation he had received no confidential information from Coonce. Defendant argues this finding was erroneous, pointing out that an attorney-client relationship exists from the moment counsel is appointed by the court (*Smith v. Superior Court* (1968) 68 Cal.2d 547, 562 [68 Cal.Rptr. 1, 440 P.2d 65] [dicta]), regardless of the absence of substantive communication between attorney and client (cf. *Morris v. Slappy* (1983) 461 U.S. 1, 14, fn. 6 [103 S.Ct. 1610, 1617, 75 L.Ed.2d 610] [no 6th Amend. requirement of "meaningful relationship" between attorney and client]). While we agree Winston formed an attorney-client relationship with Coonce upon his appointment in her cases, and such relationship evidently did not terminate until after his appointment as advisory counsel to defendant, in order to find that Winston labored under a conflict of interest during the period when he was advising defendant, we would have to conclude that Winston's duty of loyalty to Coonce as a former client potentially could have hampered his performance as defendant's advisory counsel, such as by causing him to "pull his punches" in assisting defendant in cross-examining her. Winston disclaimed such a possibility, and we may reasonably rely on that disclaimer, especially given Winston's assurance he would not undertake any future representation of Coonce. (*U.S. v. Crespo de Llano, supra,* 838 F.2d at p. 1012.) For this reason, defendant's insistence in the trial court that he was "not waiving any conflict" fails to bring this case within the rule in *Holloway v. Arkansas, supra,* 435 U.S. at page 488 [98 S.Ct. at pages 1180-1181], where the high court articulated a rule of automatic reversal in situations where a trial court requires the continuation of conflicted representation over a timely objection. In any event, assuming some potential conflict not apparent on this record, defendant fails to demonstrate it adversely affected Winston's performance as advisory counsel. (*People v. Bonin, supra,* 47 Cal.3d at pp. 837-838.)

C. *Trial court's failure to inquire into adequacy of resources available to defendant*

 Defendant contends he was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution by the

trial court's failure, despite his repeated complaints, to inquire into the adequacy of the law library and the sufficiency of the ancillary services available to him. Defendant argues the court's failure, coupled with the actual inadequacy of those resources, deprived him of his due process right to meaningful access to the courts and his Sixth Amendment right as a self-represented defendant to an opportunity to prepare his defense. (*Bounds v. Smith* (1977) 430 U.S. 817, 828 [97 S.Ct. 1491, 1498, 52 L.Ed.2d 72] [right of meaningful access to courts entails providing prisoners with adequate law libraries or adequate assistance from persons trained in the law]; *Milton v. Morris* (9th Cir. 1985) 767 F.2d 1443, 1445 [right to self-representation premised upon the right to make a defense].)[18] Defendant further contends the trial court's error affected his Eighth Amendment right to a reliable determination of guilt and penalty. We conclude that, under the circumstances of this case, defendant was denied no constitutional rights by any lack of inquiry into the resources available to him and that he has not shown those resources in fact were inadequate.

As the Attorney General points out, whenever defendant voiced complaints about his lack of access to the jail law library, the means to review tape recordings of interviews with prosecution witnesses, or access to witnesses, the trial court made an effort to address his concerns.

For example, on August 21, 23, and 29, 1989, prior to the commencement of trial, when defendant complained he had not been permitted to use the jail law library, the trial court entered orders that he be allowed access to the library at reasonable times consistent with the jail's security requirements.

On September 5, 1989, when defendant requested transcripts of all tapes of law enforcement interviews of potential witnesses in the case, the court noted for the record that defendant would be allowed to have a tape recorder in the jail; defendant acknowledged he wished to listen to the actual recordings, and the court implicitly indicated it would entertain a request for transcripts if defendant subsequently concluded he needed them. When defendant sought the court's authorization to interview witnesses adjacent to the courtroom every morning between 9:30 and 10:00, the trial court noted that time was impracticable due to the court's schedule, but offered defendant the opportunity to interview witnesses in the jury room between 4:00 and 5:00 p.m. each day. The court also asked the bailiff to inquire what facilities might be available at the jail. Thereafter, the court informed defendant there was a room available at the jail for such interviews; alternatively, in order to

---

[18] We assume, for argument's sake, that defendant's constitutional premise is valid, although this court has not yet addressed the specific question whether a defendant in propria persona who is assisted by advisory counsel is also entitled to access to a law library.

avoid subjecting witnesses to search, defendant could interview them by telephone at the jail, and the court ordered that any telephone defendant used for this purpose be disconnected from the jail recording system. The court observed that witnesses could be compelled by subpoena to appear at the jail for interviews.

When defendant complained that his investigator, Larry Cahill, was not meeting with him daily, the court corrected his misunderstanding of its earlier order (which had been that Cahill report "directly," not daily, to defendant) and invited defendant to bring to the court's attention any matter defendant needed discovered. Defendant made no further complaints about his interaction with Cahill.

When defendant complained about the inadequacy of the jail law library, the court reminded him that Advisory Counsel Winston could be called on to find materials unavailable to defendant.

In sum, the record reflects that the trial court promptly addressed each complaint defendant raised. Defendant thus fails to demonstrate that the trial court should have inquired more fully into the resources available to him.

D. *Trial court's failure to terminate defendant's in propria persona status at penalty phase*

The jury returned its guilt phase verdicts on October 10, 1989. The trial court scheduled the commencement of the penalty phase for October 16, 1989. On the latter date, the court convened outside the presence of the jury, and Advisory Counsel Winston argued for continuance of the penalty phase "for a significant period of time, a few weeks at the minimum," in order to prepare the defense case. Winston acknowledged defendant did not want a continuance of that length, and, after discussions concerning the prosecutor's upcoming trial obligations, including Seabourn's trial, the trial court scheduled the penalty phase to begin on October 23, 1989.

On that date, just after the jury was called into the courtroom for the trial on penalty, defendant asked to speak with the trial court outside the jury's presence. After the jury was excused, defendant advised the court: "I have at least a philosophical objection to begging these people for my life, and I am not going to do it, and as a result of that perhaps my attorney should, should do this phase of the trial. I am not going to. I am not going to do it." Winston told the court he had no prior knowledge of defendant's request and was not at that time prepared to proceed as counsel. The trial court stated: "I look upon this request as nothing more than an attempt to delay the prosecution in

this case. Mr. Lawley, you were properly advised . . . at the time that you sought to represent yourself, number one. Number two, you knew two weeks ago, more than two weeks ago now, that we were headed into a penalty phase trial when the jury came back with a verdict of guilty of first degree murder and found the special circumstances to be true. You have delayed all of that time until this morning with the jury sitting in the jury box ready to begin presentation of evidence to inform the Court of your feeling." After putting on the record its observations of defendant's conduct of his case and good working relationship with advisory counsel, the trial court concluded: "Having in mind the [*People v. Windham* (1977) 19 Cal.3d 121 [137 Cal.Rptr. 8, 560 P.2d 1187]] factors and having in mind the other cases that the Court has reviewed, I'm satisfied that your request is untimely. And it is, therefore, going to be denied."

█ We conclude the trial court did not abuse its discretion in so ruling.

*People v. Windham, supra,* 19 Cal.3d 121 (*Windham*), on which the trial court relied, addressed the situation in which a defendant who is represented by counsel during the first part of a trial invokes his or her right to self-representation midtrial. We held that in order to invoke the constitutionally mandated right of self-representation, a defendant in a criminal trial must unequivocally assert that right within a reasonable time prior to the commencement of the trial. Once a defendant has chosen to proceed to trial represented by counsel, his or her demand to discharge counsel and assume the defense shall be addressed to the sound discretion of the court. (*Id.* at pp. 127-128.) Factors for the trial court to consider in assessing such a request made after the commencement of the trial include "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay [that] might reasonably be expected to follow the granting of such a motion." (*Id.* at p. 128.)

Defendant's case presents the reverse scenario, i.e., a self-represented defendant who, after commencement of the trial, seeks to relinquish responsibility for his own defense and obtain the appointment of counsel to represent him for the remainder of the trial. In this situation, we have indicated that the *Windham* factors apply and that the trial court must consider the totality of the circumstances in exercising its discretion. (*People v. Gallego* (1990) 52 Cal.3d 115, 164 [276 Cal.Rptr. 679, 802 P.2d 169].)

Defendant fails to persuade us the trial court abused its discretion. Examining the *Windham* factors (*Windham, supra,* 19 Cal.3d at p. 128), we first note that despite what defendant calls the mismatch between himself and the

prosecutor, and despite the delusional themes defendant occasionally introduced into the trial, the quality of his self-representation did not compel the granting of his motion. As the Attorney General observes, defendant successfully interposed objections, cross-examined prosecution witnesses, and presented evidence in his own defense.

Second, as to defendant's proclivity to substitute counsel, the Attorney General correctly observes that defendant had previously dismissed Ernest Kinney as his attorney over a disagreement concerning the conduct of the defense, and that he often did not follow Advisory Counsel Winston's suggestions. Defendant strenuously disagrees that these circumstances yield the inference he had such a proclivity to substitute counsel as to militate against Winston's appointment as counsel for the penalty phase. In our view, while the inference might not be compelling, this factor provides some support for the trial court's ruling.

Third, as to the reasons for the request, the Attorney General argues that defendant's primary reason was his "philosophical objection to begging [the jurors] for [his] life," while defendant contends the request was made out of a recognition of his incapacity to perform the task. In our view, the record does not support a conclusion defendant was incapable of presenting a penalty phase defense.[19]

The final *Windham* factors—the length and stage of the proceedings, and the disruption or delay occasioned by the request—clearly support the trial court's ruling. Significantly, defendant allowed two weeks to elapse, from the jury's guilt phase verdict to the very day set for the commencement of the penalty phase, without making his request for appointment of counsel, or

---

[19]At the hearing on his motion, defendant asserted: "I don't believe there is any law in the land that says I can't have adequate representation. If I am going to be inadequate in my own judgment, then you are denying me adequate representation." Yet the trial court, having observed defendant defend himself in the guilt phase of trial, was not obliged to accept at face value his belated assertion of inadequacy, especially in the absence of any specific reasons why he could not present a penalty phase defense. When the trial court asked defendant if the only reason he was seeking Winston's appointment as counsel was that he did not personally wish to address the jury, defendant replied: "Your Honor, he's got policemen up here lying against me. I know that they are lying. I don't choose to badger these witnesses when they are just going to sit here and continue their thing. I am not going to beg this jury, then, to not execute me. I don't want to live in a cell where he claims I am holding him and I—It is impossible for me to do these things. [¶] . . . [¶] The answer to your question, Your Honor, is I don't think I have—I am not going to have any defense at all if I am defending myself because it is going to be the prosecution versus me just sitting here. That is no defense. And not being suicidal, I—I felt it was time to ask my attorney." Defendant's reference to himself "just sitting here" strongly suggests he was threatening to "opt out" of taking an active role in his defense, inferentially due to his "philosophical objection" to asking the jury to spare his life.

even mentioning his intention to advisory counsel. The timing of the request thus strongly suggests, as the trial court found, an attempt to delay the trial. And Winston's appointment as counsel indeed would have necessitated substantial delay, which in turn would have thrown into doubt the jury's continued availability. Under the totality of the circumstances, we conclude the trial court did not abuse its discretion in denying defendant's request for Winston's appointment as counsel at the penalty phase, and the record fails to establish a miscarriage of justice or violation of defendant's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.[20]

## III. *Guilt phase evidentiary and disclosure issues*

### A. *Exclusion of evidence regarding Aryan Brotherhood contract for murder of Stewart; related prosecutorial misconduct*

Defendant contends he was denied his Fifth and Fourteenth Amendment rights to due process, a fair trial, and a reliable judgment as guaranteed by the Eighth Amendment, as a result of the trial court's rulings excluding proffered evidence that Brian Seabourn had killed Kenneth Stewart pursuant to a contract issued by the Aryan Brotherhood prison gang. The issue arose in the following context.

Immediately after the prosecution rested its case, defendant called his first witness, Monty Ray Mullins. The prosecutor objected to the testimony of Mullins and another proposed defense witness, David Hager, on the ground that "absent an offer of proof, there is absolutely no basis for their testimony." Declining to rule "in a vacuum," the trial court permitted Mullins to take the stand. Mullins testified he had met Brian Seabourn in Folsom State Prison and that he had had a conversation with Seabourn about "a homicide." The prosecutor objected on hearsay grounds to testimony regarding what Seabourn had told Mullins. Defendant asserted Seabourn's statement would be admissible as a declaration against penal interest. The prosecutor countered that there was no showing Seabourn was unavailable, to which defendant responded he expected Seabourn to "take the Fifth Amendment." The trial court excused the jury and heard the parties' arguments regarding the proffered testimony.

Defendant's offer of proof was that Mullins would testify that Seabourn told him Seabourn had killed someone, an innocent person was incarcerated

---

[20]Cases on which defendant relies—*People v. Hill* (1983) 148 Cal.App.3d 744, 760 [196 Cal.Rptr. 382]; *People v. Cruz* (1978) 83 Cal.App.3d 308, 319-320 [147 Cal.Rptr. 740]; and *People v. Elliott* (1977) 70 Cal.App.3d 984, 993-994 [139 Cal.Rptr. 205]—found abuses of discretion in trial courts' refusals to reinstate counsel at significantly earlier stages: in *Hill*, before jury selection; in *Elliott*, after jury selection; and in *Cruz*, on the date set for trial.

for it, and the Aryan Brotherhood had directed Seabourn to commit the crime. Seabourn had shown Mullins letters from the Aryan Brotherhood directing the murder. Defendant also proffered that David Hager would testify that Seabourn had admitted killing Stewart at the direction of the Aryan Brotherhood for the sum of about $6,000. The court asked Mullins if Seabourn had identified defendant by name, to which Mullins responded, "I'd like to take the Fifth." The court also asked Mullins if Seabourn had said he was expecting or had received any money for the killing; Mullins replied, "From the [Aryan Brotherhood,] no." Mullins said he was led to believe there were drugs and/or money involved in the transaction, but Seabourn did not identify who was paying him.

The prosecutor contended the proffered testimony was inadmissible for several reasons: Seabourn's statements to Mullins and Hager were hearsay; because the statements to Mullins did not identify the victim, and Seabourn never identified the allegedly innocent person in jail, the statements might not even relate to defendant's case; in any event, whether someone was innocent was an opinion or legal conclusion; and any letter allegedly mentioning the Aryan Brotherhood was double hearsay.

The court ultimately ruled on the admissibility of the proffered testimony as follows: Seabourn was unavailable for purposes of Evidence Code section 1230; Seabourn's statement to Mullins that "I killed a man in Modesto" was admissible, assuming it related to the killing of Stewart and not some other killing, as a declaration against penal interest; Seabourn's statement that he was hired to kill the victim was also admissible as a declaration against penal interest; that Seabourn said the Aryan Brotherhood had directed him to kill the victim was inadmissible because *who* told him to do so was not against his penal interest; the letter purportedly stating that the Aryan Brotherhood had ordered Seabourn to kill Stewart was double hearsay not admissible under any exception; and Seabourn's statement that an innocent man was in jail was inadmissible as a conclusion and opinion of the declarant. With respect to the proffered testimony of David Hager, the court ruled that Seabourn's statements to Hager were admissible to the same extent as were his statements to Mullins, and the statement that Seabourn had received $6,000 for the killing was admissible as a declaration against penal interest. Defendant then excused Mullins as a witness and declined to call Hager.

Defendant now contends the trial court abused its discretion in excluding the proffered testimony that Seabourn had admitted killing Stewart at the direction of the Aryan Brotherhood and that he had said an innocent person was charged with the crime. The error, defendant further contends, violated his federal constitutional rights as enumerated above.

First, defendant contends the proffered evidence satisfied Evidence Code section 1230 and should have been admitted under the hearsay exception for declarations against penal and social interest. That statute provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (*Ibid.*)

With respect to the penal interest exception, the proponent of the evidence "must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611 [101 Cal.Rptr.2d 701, 12 P.3d 1110]; *People v. Lucas* (1995) 12 Cal.4th 415, 462 [48 Cal.Rptr.2d 525, 907 P.2d 373].) A court may not, applying this hearsay exception, find a declarant's statement sufficiently reliable for admission " '*solely because* it incorporates an admission of criminal culpability.' " (*People v. Duarte, supra*, at p. 611, quoting *People v. Campa* (1984) 36 Cal.3d 870, 883 [206 Cal.Rptr. 114, 686 P.2d 634].) As the high court reasoned in interpreting the analogous exception to the federal hearsay rule, "[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory nature. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." (*Williamson v. United States* (1994) 512 U.S. 594, 599-600 [114 S.Ct. 2431, 2435, 129 L.Ed.2d 476].) Whether a statement is self-inculpatory or not can only be determined by viewing the statement in context. (*Id.* at p. 603 [114 S.Ct. at p. 2436].)

In view of these concerns, this court "long ago determined that 'the hearsay exception should not apply to collateral assertions within declarations against penal interest.' [Citation.] . . . [W]e have declared [Evidence Code] section 1230's exception to the hearsay rule 'inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant.' " (*People v. Duarte, supra*, 24 Cal.4th at p. 612.)

We review a trial court's decision as to whether a statement is against a defendant's penal interest for abuse of discretion. (*People v.*

*Gordon* (1990) 50 Cal.3d 1223, 1250-1253 [270 Cal.Rptr. 451, 792 P.2d 251].) Under these standards, we conclude the trial court did not abuse its discretion in ruling admissible Seabourn's statement to the effect that he was hired and paid to kill Stewart, and did kill him; the trial court likewise did not abuse its discretion in excluding Seabourn's statement that the Aryan Brotherhood was the party that had hired him. As the Attorney General reasons, nothing about *who* hired Seabourn to kill Stewart made Seabourn more culpable than did the other portions of his statement. Defendant argues the excluded portion of the statement would have specifically inculpated Seabourn in the additional crime of conspiracy with the Aryan Brotherhood, but the argument fails to recognize that *any* murder for hire partakes of the elements of conspiracy; thus, Seabourn's naming of the Aryan Brotherhood was not specifically disserving of his interests. As the trial court further recognized, Seabourn's statement that an innocent man was in jail for the crime was inadmissible as an opinion and conclusion on Seabourn's part; to the extent the statement was an assertion of fact, it was hearsay not within the penal interest exception. Finally, the proffered testimony regarding the unauthenticated letter, prepared under unknown circumstances, allegedly by an unidentified writer on behalf of the Aryan Brotherhood, was not shown to be sufficiently reliable to merit admission into evidence.

Defendant contends Seabourn's statement that he killed Stewart at the direction of the Aryan Brotherhood was sufficiently reliable and critical to the defense that it should have been admitted as a matter of due process. He relies on *Chambers v. Mississippi* (1973) 410 U.S. 284 [93 S.Ct. 1038, 35 L.Ed.2d 297], a murder prosecution in which the defense sought to establish the culpability of a third party, one McDonald, who had signed a confession to the crime for which the defendant was on trial and who had made similar inculpatory statements to others. The defense called McDonald as a witness, but he repudiated his earlier confession and denied any involvement. Mississippi evidentiary law precluded the defense from either cross-examining McDonald or presenting witnesses who might have discredited his repudiation and demonstrated his complicity. The high court held that, in the circumstances of that case, the combined effect of the state's evidentiary rules precluding impeaching a party's own witness and limiting admission of hearsay declarations against penal interest operated to foreclose presentation of potentially exculpatory evidence crucial to the defense and thus deprived the defendant of due process. (*Id.* at p. 302 [93 S.Ct. at p. 1049].)

As we observed in *People v. Hawthorne* (1992) 4 Cal.4th 43 [14 Cal.Rptr.2d 133, 841 P.2d 118], however, the court made clear that in reaching its judgment it established no new principles of constitutional law, nor did its holding " 'signal any diminution in the respect traditionally

accorded to the States in the establishment and implementation of their own criminal trial rules and procedures.' " (*Id.* at p. 56, quoting *Chambers v. Mississippi, supra,* 410 U.S. at pp. 302-303 [93 S.Ct. at pp. 1049-1050].) The general rule remains that " 'the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' " (*People v. Cudjo* (1993) 6 Cal.4th 585, 611 [25 Cal.Rptr.2d 390, 863 P.2d 635], quoting *People v. Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99].)[21]

 We likewise find no merit in defendant's argument that the proffered evidence should have been admitted under the exception for a declaration against social interest. Defendant fails to persuade us that the excluded evidence possessed sufficient reliability to demand its admission. Moreover, as the Attorney General persuasively suggests, for a convicted felon like Seabourn, who, according to Mullins and Hager, was seeking full membership in the Aryan Brotherhood, to claim to be carrying out that organization's will in killing Stewart might have been an exercise designed to enhance its prestige or his own. Defendant, at least, fails to cite any evidence in the record suggesting Seabourn's statement created a risk of making him an object of hatred, ridicule, or social disgrace in the relevant community.

Defendant further contends the trial court was required to admit the entirety of Seabourn's statements to Mullins and Hager under Evidence Code section 356, which provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." As defendant concedes, however, he was the proponent, not the opponent, of the statements, hence the statute does not govern his claim.

Because we have found no error in the trial court's rulings, we find it unnecessary to address defendant's contention that the *Chapman* standard of

[21]Defendant relies on *U.S. v. Paguio* (9th Cir. 1997) 114 F.3d 928, in which the court of appeals reversed a conviction due to the exclusion of an extrajudicial statement by the defendant's father expressly assuming responsibility for the offense and declaring the defendant-son had "nothing to do with it." (*Id.* at p. 931.) The court of appeals held the portion of the statement exonerating the son was incriminating to the father, as it admitted "leading others into wrongdoing," a basis for a federal sentencing enhancement. (*Id.* at pp. 933-934.) In contrast, nothing in Seabourn's statements expressly exculpated defendant, and the reference to some unidentified "innocent man" being in jail for the murder did not further incriminate Seabourn.

review should apply. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065] [prejudice resulting from federal constitutional error is assessed under harmless beyond a reasonable doubt standard].)

◼ In a related claim, defendant argues the prosecutor engaged in misconduct when, in closing argument, he asserted: "Defense case. What was the defense in this case? A total farce is what the defense was in this case." Later in his argument, referring to defendant's attempts to impeach witnesses and to suggest he was framed because of his aspiration to be recognized as the Beast in Revelations, the prosecutor commented: "Now, take your pick, that's the defense. Now, I would submit to you that the defense is ludicrous in this case. There hasn't been a defense in this case." Finally, defendant cites as misconduct the following remarks by the prosecutor in the course of closing argument: "And ask yourself this, what motive did Brian Seabourn or Steve Mendonca or anybody else in that group have to kill Kenneth Stewart? Did you hear anything in this case at all about anybody being mad at Kenneth Stewart for any reason and wanting to kill him? Did you hear that Brian Seabourn was mad at him? Did you hear that Steve Mendonca was mad at him? Anybody else was mad at him? No. You heard that Dennis Lawley was mad at him. Why? Because Dennis Lawley got ripped off with his dope and his money." And: "Now, nobody else in this case had a reason to kill Kenneth Stewart."

Anticipating the argument that his failure to object to these remarks and seek a curative admonition at trial resulted in forfeiture of any claim of error on appeal (*People v. Cain* (1995) 10 Cal.4th 1, 48 [40 Cal.Rptr.2d 481, 892 P.2d 1224]), defendant contends any objection would have been futile, as the state of the evidence before the jury, notwithstanding his effort to obtain admission of the Aryan Brotherhood testimony, supported the prosecutor's remarks. That it did so, however, refutes defendant's claim that the prosecutor engaged in misconduct, i.e., the use of deception or reprehensible methods to persuade the jury. (*People v. Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Because the prosecutor's argument constituted fair comment on the evidence, following evidentiary rulings we have upheld, there was no misconduct and, contrary to defendant's claim, no miscarriage of justice. Thus, the cases on which defendant relies, *People v. Daggett* (1990) 225 Cal.App.3d 751 [275 Cal.Rptr. 287] and *People v. Varona* (1983) 143 Cal.App.3d 566 [192 Cal.Rptr. 44], are inapposite: each involved erroneous evidentiary rulings on which the prosecutor improperly capitalized during his closing argument.

B. *Denial of view of defendant's cabin*

Defendant contends reversal is required because the trial court prejudicially erred in denying his request for a jury view of his cabin pursuant to

section 1119, resulting in a miscarriage of justice, denial of due process and an unreliable verdict. We disagree.

As noted *ante*, at pages 118-120, Anderson testified to certain observations he had made while inside defendant's cabin. In particular, Anderson testified that he saw defendant, Coonce and Mendonca enter the cabin's bathroom and, through its partly open door, saw a gun change hands.

At trial, defendant requested that the jury be allowed to view the cabin and its interior, on the theory that Anderson could not have seen into the bathroom from where he was sitting and thus could not have seen a gun being passed from one person to another. The trial court asked for an offer of proof regarding whether the cabin had been changed since defendant resided there and whether defendant's investigator could go to the cabin, take measurements and prepare a diagram as a defense exhibit, comparable to the existing diagram, People's exhibit 33, thus obviating the need to take the jury there. Defendant used a photograph previously taken of the cabin in cross-examining Anderson.

The trial court later inquired whether the parties had any photographs that might clarify the position of the table where Anderson was sitting in relation to the bathroom. The parties agreed there were no photographs illustrating the view from the table toward the bathroom door. The court then directed the prosecution to take several measurements in the cabin to assist it in ruling on defendant's motion.

Later, having complied with the court's request, Detective Deckard testified he went to defendant's cabin and took certain photographs and measurements. The interior of the cabin had changed, in that a wall had been added to create a bedroom area and the furniture was different. Deckard took photographs from the new bedroom area looking toward the bathroom, one of which depicted the prosecutor standing in the bathroom with the door open approximately an inch and a half, as well as a photograph from the bathroom sink looking toward the bedroom. From the approximate location where Anderson had been sitting, Deckard testified he could see the prosecutor standing in the bathroom, and that this was depicted in two photographs he had taken.

Deckard further testified he took several measurements, establishing that the cabin's interior was 17 feet from east to west and 12 feet two inches from north to south; the width of the bathroom door was two feet six inches; from the west wall to the west opening of the door was four inches; the extension of the wall on the other side of the door was 12 inches; from the

north wall to the molding of the closet (the north side of the closet door) was nine feet five inches; and from the approximate location of the chair where Anderson was sitting to the bathroom door was 10 feet. On cross-examination, defendant elicited that Anderson had apparently been sitting five to six feet from the bathroom door, while Deckard's picture was taken 10 feet from the bathroom door. Defendant also elicited from Deckard that when he took the photograph of the prosecutor standing in the bathroom, he could not see all of the prosecutor's body and, in fact, could see only his back against the wall, not the front of his body.

The trial court denied defendant's motion to have the jury view the cabin, finding the jury had an adequate view of the scene from the photographs and diagram as marked with the measurements Deckard had taken. This ruling, defendant contends, was prejudicially erroneous and rendered the eventual verdict unreliable.

Section 1119 provides: "When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, or any personal property which has been referred to in the evidence and cannot conveniently be brought into the courtroom, it may order the jury to be conducted in a body, in the custody of the sheriff or marshal, as the case may be, to the place, or to the property, which must be shown to them by a person appointed by the court for that purpose; and the officer must be sworn to suffer no person to speak or communicate with the jury, nor to do so himself or herself, on any subject connected with the trial, and to return them into court without unnecessary delay, or at a specified time."[22] A court's ruling on a party's motion for a jury view is reviewed for abuse of discretion (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68]), i.e., whether the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice (*People v. Sanders* (1995) 11 Cal.4th 475, 512 [46 Cal.Rptr.2d 751, 905 P.2d 420]). "When the purpose of the view is to test the veracity of a witness's testimony about observations the witness made, the trial court may properly consider whether the conditions for the jury view will be substantially the same as those under which the witness made the observations, whether there are other means of testing the veracity of the witness's testimony, and practical difficulties in conducting a jury view." (*People v. Price* (1991) 1 Cal.4th 324, 422 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

The trial court did not act absurdly or irrationally in denying defendant's motion in light of the other available means of testing the veracity of

[22]At the time of defendant's trial, section 1119 was similar in all relevant respects.

Anderson's testimony regarding his observations. The jury could examine the photographs and diagram of the interior of the cabin that were admitted into evidence, and a view of the scene would have added little. Defendant, moreover, was free to send an investigator to the cabin to obtain any measurements he believed essential. Defendant argues a view was necessary because the photographs and diagram did not reflect what he asserts to be the fact that, contrary to Anderson's testimony, it was physically impossible for three people to fit inside the bathroom. Whether defendant voiced this reason in support of his request for the view is unclear from the record. In any event, the jury, aware of the approximate dimensions of the cabin and the bathroom, was capable of drawing appropriate inferences regarding the veracity of Anderson's testimony.

C. *Trial court's failure to order disclosure of identity of confidential informant*

Two search warrants were issued for the search of defendant's cabin in Butler's Camp, one on January 20, 1989, requested by Detective Dwayne Hardenbrook of the Modesto Police Department and seeking evidence related to the possession and sale of illegal drugs, the other on January 24, 1989, requested by Detective Gary Deckard of the Stanislaus County Sheriff's Department and seeking evidence related to the murder of Kenneth Stewart. Both warrants were based in part on information from the same confidential informant.

Prior to trial, the defense moved for, and the prosecution opposed, disclosure of the informant's identity. (See Evid. Code, §§ 1041, 1042, subd. (d).) On July 13, 1989, at defendant's request, Superior Court Judge Frank S. Pierson ordered that the assigned trial judge hold an in camera hearing to resolve the motion. On August 24, 1989, the trial court held the required in camera hearing. At the conclusion of the hearing, the court found the informant had no evidence that would be in any way exculpatory to defendant and denied the motion. Defendant contends the court erred.

 As defendant correctly argues, the prosecution must disclose the name of an informant who is a material witness in a criminal case or suffer dismissal of the charges against the defendant. (*Eleazer v. Superior Court* (1970) 1 Cal.3d 847, 851 [83 Cal.Rptr. 586, 464 P.2d 42].) An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant. (*People v. Borunda* (1974) 11 Cal.3d 523, 527 [113 Cal.Rptr. 825, 522 P.2d 1].) The defendant bears the burden of adducing " ' "some evidence" ' " on this score. (*People v. Gordon, supra,* 50

Cal.3d at p. 1246, quoting *People v. Hardeman* (1982) 137 Cal.App.3d 823, 828 [187 Cal.Rptr. 296].)

The parties join in requesting this court to review the sealed transcript of the in camera hearing to determine whether the trial court correctly applied the foregoing standard, and we have done so. Based on that review, we reject defendant's supposition that the in camera examination of the informant was conclusionary and superficial. To the contrary, the record demonstrates, based on a sufficiently searching inquiry, that the informant could not have provided any evidence that, to a reasonable possibility, might have exonerated defendant.

## IV. *Guilt phase instructional issues*

### A. *Instruction regarding accomplice testimony*

Two possible accomplices testified in this case: Ricky Black, who told the jury of his role in luring Kenneth Stewart into Brian Seabourn's car, and Treva Coonce, whose testimony was exculpatory, but who—other witnesses testified—had made out-of-court statements inculpating defendant. The trial court instructed the jury that Black was an accomplice as a matter of law, but that it was for the jury to determine whether Coonce was an accomplice. The trial court read the jury the standard instructions pertaining to accomplice testimony, including the corroboration rule (CALJIC Nos. 3.11, 3.12, 3.13) and the rule regarding distrust of accomplice testimony (CALJIC No. 3.18). Defendant now contends the trial court erred in failing to modify, sua sponte, the standard instructions (1) to make clear that the corroboration rule applies to both in-court testimony and out-of-court statements of accomplices (CALJIC No. 3.11), (2) to add the word "statement" to the instruction defining corroboration (CALJIC No. 3.12), and (3) to clarify that only the accomplice's *inculpatory* statements should be viewed with distrust (CALJIC No. 3.18). The errors, he asserts, violated his Sixth Amendment rights.

On defendant's first point, we agree that *People v. Andrews* (1989) 49 Cal.3d 200, 214 [260 Cal.Rptr. 583, 776 P.2d 285] (*Andrews*) supports the application of the corroboration requirement to out-of-court statements as well as testimony.[23] As in *Andrews*, however, the trial court here was not required to modify the standard instruction absent a request by defendant in view of the circumstance that neither the trial court nor the parties suggested

[23]Following the decision in *Andrews, supra*, 49 Cal.3d 200, CALJIC No. 3.11 was modified to specifically advise the jury that "Testimony of an accomplice includes any out-of-court statement purportedly made by an accomplice received for the purpose of proving that what the accomplice stated out-of-court was true." (CALJIC No. 3.11 (6th ed. 1996).)

to the jury that, with respect to the corroboration requirement, it should distinguish between Coonce's out-of-court and in-court statements. (See *Andrews*, *supra*, at pp. 214-215.)

With respect to defendant's second point, addition of the word "statement" to the standard instruction would have been legally correct, but defendant cites no authority that would have imposed on the trial court the sua sponte duty so to modify CALJIC No. 3.12. (*Andrews*, *supra*, 49 Cal.3d at pp. 214-215; see also *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1142-1143 [36 Cal.Rptr.2d 235, 885 P.2d 1] [the defendant bears the burden of seeking modification or clarification of a legally correct instruction].)

Finally, with respect to defendant's third point, in *People v. Guiuan* (1998) 18 Cal.4th 558, 568-569 [76 Cal.Rptr.2d 239, 957 P.2d 928], this court endorsed the type of instruction for which defendant argues, holding that "the instruction concerning accomplice testimony should *henceforth* refer only to testimony that tends to incriminate the defendant. . . . Accordingly, we conclude that the jury should be instructed to the following effect whenever an accomplice, or a witness who might be determined by the jury to be an accomplice, testifies: 'To the extent an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in the case.'" (*Id.* at p. 569, italics added, fn. omitted; CALJIC No. 3.18 (1999 rev.) (6th ed. 1996).) As indicated, however, we applied the new requirement prospectively only and found no error in the trial court's reading to the jury an instruction consistent with then existing law. (*Guiuan*, *supra*, at p. 570.) Likewise here, the trial court did not err in instructing the jury consistently with then existing law.

In any event, the jury was made keenly aware of the inconsistencies among Coonce's various in-court and out-of-court statements, as well as the prosecutor's acknowledgment that Coonce was not always truthful and that it was up to the jury to determine her credibility. Under these circumstances, it is not reasonably probable the jury would have reached a result more favorable to defendant had the trial court instructed it along the lines for which defendant argues. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

*Cool v. United States* (1972) 409 U.S. 100, 104 [93 S.Ct. 354, 357, 34 L.Ed.2d 335], on which defendant relies, is inapposite. There, in a case in which the defense rested almost entirely on accomplice testimony, the high

court concluded that an instruction essentially directing the jury that exculpatory testimony of an accomplice had to be proven true beyond a reasonable doubt before it could be considered at all, infringed the defendant's Sixth Amendment right to present a defense and effectively reversed the burden of proof to require the defendant to establish her innocence beyond a reasonable doubt. No such flaw appears in California's pattern accomplice instructions as given in this case, and the consequent absence of constitutional error refutes defendant's contention that the *Chapman* standard applies. (*Chapman v. California, supra,* 386 U.S. at p. 24 [87 S.Ct. at p. 828] [prejudice resulting from federal constitutional error is assessed under harmless beyond a reasonable doubt standard].)

B. *CALJIC No. 2.11.5*

The jury was instructed in the language of CALJIC No. 2.11.5 as follows: "There has been evidence in this case indicating that persons other than the Defendant [were] or may have been involved in the crime for which the Defendant is on trial. Do not discuss or give any consideration to why the other persons are not being prosecuted in this trial or whether they have been or will be prosecuted." Noting the jury was also informed that Ricky Black and Treva Coonce had received immunity in exchange for their testimony, defendant contends the effect of giving CALJIC No. 2.11.5 in this case was to direct the jury, in assessing the witnesses' credibility, to disregard their expectations of leniency in testifying for the prosecution.

As we said in *People v. Cain, supra,* 10 Cal.4th at pages 34-35: "We previously rejected this specific claim under substantially similar circumstances. (*People v. Price, supra,* 1 Cal.4th at pp. 445-446.) In so doing, we explained: 'The purpose of the challenged instruction is to discourage the jury from irrelevant speculation about the prosecution's reasons for not jointly prosecuting all those shown by the evidence to have participated in the perpetration of the charged offenses, and also to discourage speculation about the eventual fates of unjoined perpetrators. (*People v. Cox* (1991) 53 Cal.3d 618, 668 [280 Cal.Rptr. 692, 809 P.2d 351].) When the instruction is given with the full panoply of witness credibility and accomplice instructions, as it was in this case, [jurors] will understand that although the separate prosecution or nonprosecution of coparticipants, and the reasons therefor, may not be considered on the issue of the charged defendant's guilt, a plea bargain or grant of immunity may be considered as evidence of interest or bias in assessing the credibility of prosecution witnesses. (*People v. Sully* [(1991)] 53 Cal.3d 1195, 1219 [283 Cal.Rptr. 144, 812 P.2d 163].) Although the instruction should have been clarified or omitted (see *People v.*

*Cox, supra*, [53 Cal.3d] at p. 667; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1313 [248 Cal.Rptr. 834, 756 P.2d 221]), we cannot agree that giving it amounted to error in this case.' (*People* v. *Price, supra*, 1 Cal.4th at p. 446.) Here, as in *Price*, standard instructions on accomplice testimony were given; the *Price* analysis is thus dispositive of defendant's claim."

V. *Claimed collateral estoppel effect of Brian Seabourn's acquittal of first degree murder charge*

Defendant argues that, under the collateral estoppel principles articulated in *People v. Taylor* (1974) 12 Cal.3d 686 [117 Cal.Rptr. 70, 527 P.2d 622], his conviction of first degree murder with special circumstances and conspiracy to commit murder must be reversed because his criminal liability was predicated on the actions of the actual killer, Brian Seabourn, who, after defendant's trial, was convicted of only second degree murder (and thus implicitly was acquitted of first degree murder).[24] ▮ In *People v. Taylor*, we reiterated the rule that collateral estoppel bars relitigation of an issue decided at a previous trial "if (1) the issue necessarily decided at the previous trial is identical to the one which is sought to be relitigated; if (2) the previous trial resulted in a final judgment on the merits; and if (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior trial." (*Taylor, supra*, at p. 691.) We identified the purposes of the collateral estoppel doctrine as promoting judicial economy by minimizing repetitive litigation, preventing inconsistent judgments that undermine the integrity of the judicial system, and providing repose by preventing a person from being harassed by vexatious litigation. (*Id.* at p. 695.) *Taylor* expressly limited the application of the doctrine to "the particular circumstances of the instant case where an accused's guilt must be predicated on his vicarious liability for the acts of a previously acquit[t]ed confederate." (*Id.* at p. 698.)

▮ *Taylor* does not support reversal of defendant's conviction in the present case. " '[I]n cases where there are multiple defendants, or in multiple cases arising out of the same offense, the mere fact standing alone that verdicts are, or appear to be, inconsistent, does not give rise to collateral estoppel. Specific issues may be decided differently in different cases. [Citation.] Likewise, a judgment acquitting one defendant does not generally bar subsequent criminal liability of a codefendant.' " (*People v. Howard* (1988) 44 Cal.3d 375, 412, fn. 13 [243 Cal.Rptr. 842, 749 P.2d 279], quoting

---

[24]Defendant requests that the court take judicial notice of the court files and transcripts of *People v. Seabourn* (Super. Ct. Stanislaus County, 1991, No. 244904). We grant the request. (See Evid. Code, §§ 452, subd. (d) [judicial notice may be taken of the records of any court of this state], 452.5 [pertaining to court records relating to criminal convictions].)

*People v. Mata* (1978) 85 Cal.App.3d 233, 237 [149 Cal.Rptr. 327]; see also *People v. Palmer* (2001) 24 Cal.4th 856, 866 [103 Cal.Rptr.2d 13, 15 P.3d 234].) Defendant cites various decisions to the contrary (*United States v. Smith* (D.C. Cir. 1973) 478 F.2d 976, 979; *United States v. Shuford* (4th Cir. 1971) 454 F.2d 772, 779; *United States v. Prince* (4th Cir. 1970) 430 F.2d 1324, 1325 (*per curiam*); *Schmidt v. State* (1973) 261 Ind. 81 [300 N.E.2d 86, 87-88]; *State v. Spencer* (1973) 18 N.C.App. 499 [197 S.E.2d 232]), but because they lack any reasoning in support of the rule they articulate, we find them unpersuasive.

Defendant contends his liability for Stewart's murder is wholly derivative of that of Seabourn, the actual killer, and he argues he therefore cannot be guilty of a greater crime than Seabourn. First, we note that, as a factual matter, the prosecution argued defendant's guilt on the theories that he both conspired with and aided and abetted Brian Seabourn. Thus, relevant to defendant's liability were his own actions and state of mind, not solely those of Seabourn's, and it would be inaccurate to characterize defendant's liability as wholly derivative of Seabourn's. Second, we have recently rejected his contention as a matter of law. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1122 [108 Cal.Rptr.2d 188, 24 P.3d 1210].)

Finally, defendant argues, "How can [defendant's] verdict be deemed reliable under the Eighth Amendment when the actual killer, represented by counsel and facing essentially the same evidentiary hurdles, is acquitted of the death qualifying counts for which [defendant] was previously convicted? Whether or not *Taylor* and the princip[le] of collateral estoppel literally apply to this case is not as critical as what the inconsistency shows about the arbitrariness and unfairness of [defendant's] sentence." Contrary to defendant's argument, however, merely demonstrating that Seabourn was subsequently convicted of a lesser offense and therefore received a lesser sentence does not establish that defendant's sentence was either arbitrary or unfair. The respective juries in the two cases might have differently assessed the two men's culpability in light of defendant's role as instigator of the offense and as the person who furnished the weapon used and payment for the crime, and Seabourn's jury's failure to find the murder was for financial gain may simply reflect lenity. As the Attorney General argues, the different verdicts may reflect the belief that Seabourn would not have murdered Stewart but for defendant's desire, motive, weapon and payment. We cannot conclude that the different verdicts in the two cases render defendant's verdict constitutionally infirm.

## VI. *Penalty phase issues*

### A. *Eliciting facts of 1978 brandishing incident of which defendant was acquitted by reason of insanity*

Defendant complains the jury considered, as an improper aggravating factor, evidence that in 1978 he assaulted a police officer with a firearm, when in fact, unknown to the jury, he had been found not guilty by reason of insanity of that offense. Defendant suggests the error violated the Eighth Amendment to the United States Constitution and thus requires reversal.

First, we note it was defendant who elicited the facts of the incident during his examination of Dr. Berg, the prosecution having neither charged nor argued the incident in its case in aggravation. Thus, as the Attorney General argues, defendant invited any error that occurred. (*People v. Memro* (1995) 11 Cal.4th 786, 878 [47 Cal.Rptr.2d 219, 905 P.2d 1305].)

In any event, we reject defendant's premise that the jury was not informed of the finding of insanity in the earlier case. In the course of his examination concerning the incident, defendant asked Dr. Berg: "How did all this lead to my being found legally insane?" Dr. Berg summarized for the jury the findings of the psychiatrists who had examined defendant at the time of the trial on the 1978 assault: "Both of them diagnosed paranoid schizophrenia. Both of them said you were delusional. That you had loose associations. That you were not able to connect your ideas properly, and that you had a long history of mental disturbance." Dr. Berg added that one of the psychiatrists had found defendant legally insane. Defendant further elicited from Dr. Berg that, as a result, he was committed to Atascadero State Hospital, where he spent four years before his release on a successful petition for restoration of sanity. Thus, although the jury was not informed in technical terms of the verdict of not guilty by reason of insanity in the 1978 case, it did learn defendant had been found legally insane and had spent four years in a mental hospital as a consequence.

Moreover, the trial court instructed the jury that "[i]n determining which penalty is to be imposed on Dennis Lawley, you should consider, take into account and be guided by all of the mitigating factors you deem to be applicable, including but not limited to any aspect of his mental condition. Any mental or psychiatric disability that you find is currently present in Mr. Lawley or you find was present at the time of the commission of the offenses charged in this case, may be considered by you as a circumstance in mitigation. [¶] Evidence of the existence of any such mental or psychiatric

disability may never be considered by you as a circumstance in aggravation."

In the circumstances, we find it not reasonably possible the jury improperly considered the 1978 brandishing incident in aggravation. (*People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

### B. *Failure to instruct on lingering doubt*

The trial court refused defendant's requested instruction defining the concept of lingering doubt and informing jurors that if any of them entertained a lingering or residual doubt concerning whether defendant had hired someone to kill Stewart, he or she must consider such doubt as a mitigating factor. Defendant contends the refusal violated his rights under article I, sections 7 and 17 of the California Constitution and the Fifth, Eighth and Fourteenth Amendments to the United States Constitution. We have previously held that "there is no requirement, under either state or federal law, that the court specifically instruct the jury to consider any residual doubt of defendant's guilt." (*People v. Sanchez* (1995) 12 Cal.4th 1, 77 [47 Cal.Rptr.2d 843, 906 P.2d 1129], italics omitted, citing, inter alia, *Franklin v. Lynaugh* (1988) 487 U.S. 164, 173-174 [108 S.Ct. 2320, 2327, 101 L.Ed.2d 155].) While acknowledging cases so holding, defendant distinguishes them on the basis that defense counsel, in those cases, argued the concept of lingering doubt to the jury. Here, he asserts, he made no lingering doubt argument but instead gave a long summation extolling Brian Seabourn. Thus, the absence of the instruction, coupled with the absence of argument, meant the jury was never introduced to the concept of lingering doubt, resulting in prejudice.

As the Attorney General reasons, however, defendant, having sought the instruction, was well aware of the concept of lingering doubt and could have argued it had he believed it beneficial to himself. That he failed to do so cannot convert the trial court's ruling into error. The jury was instructed, moreover, that it could consider the circumstances of the crime (§ 190.3, factor (a)), any other circumstances that extenuated its gravity (§ 190.3, factor (k)), and any sympathetic or other aspect of defendant's character or record that suggested a sentence other than death (CALJIC No. 8.85). This instruction, as we have noted (e.g., *People v. Sanchez, supra*, 12 Cal.4th at pp. 77-78), is sufficiently broad to encompass any residual doubt any jurors might have entertained.

### C. *Alleged instructional errors and challenges to death penalty law*

Defendant raises a variety of constitutional challenges to the death penalty law and related instructions, many of which, he acknowledges, we have previously rejected.

First, he contends the instruction pertaining to the circumstances of the crime (§ 190.3, factor (a) (factor (a)); CALJIC No. 8.85) failed to adequately guide the jury's sentencing discretion, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. To the contrary, factor (a) is not unconstitutionally vague. (*Tuilaepa v. California* (1994) 512 U.S. 967, 976 [114 S.Ct. 2630, 2637, 129 L.Ed.2d 750]; *People v. Sanders, supra,* 11 Cal.4th at pp. 563-564.) Defendant contends the prosecutor's closing argument, commenting with respect to factor (a) that the jury could consider the fact of Stewart's murder and the financial-gain special-circumstance finding, "created a factor that was so vague as to encourage arbitrary and capricious decision making." We are unable to discern how the brief remark defendant cites could have had such an effect.

Defendant further argues that the instruction pertaining to prior criminal activity involving the express or implied threat to use force or violence (§ 190.3, factor (b) (factor (b)) was unconstitutionally vague and ambiguous because it permitted the jury to consider in aggravation situations in which defendant was merely reacting to real or imagined attacks upon himself or to circumstances he did not cause. He thus characterizes as merely reactive his conduct in the Gary's Drive-In incident, where he brandished a knife and threatened to stab a man who approached him as he sat in his car; the Savemart store incident, where he kicked a store employee; and the Harris incident, in which he punched Danny Wisner in the eye, after having kicked the three-year-old son of Michael Harris while in the grip of what he now terms an insane delusion. As the Attorney General argues, defendant's characterization of these incidents is not the only or necessarily the most reasonable one. Contrary to defendant's argument, the factor (b) instruction was not vague (*Tuilaepa v. California, supra,* 512 U.S. at pp. 976-977 [114 S.Ct. at p. 2637]; *People v. Osband* (1996) 13 Cal.4th 622, 703-704 [55 Cal.Rptr.2d 26, 919 P.2d 640]) and did not preclude the jury from according these incidents the weight it believed appropriate in the circumstances.

Defendant further argues that the portion of CALJIC No. 8.85 directing the jury to consider all the evidence received during any part of the trial of the case, except as it was otherwise instructed, violated the Eighth and Fourteenth Amendments to the United States Constitution in permitting the jury to consider nonstatutory aggravating evidence. Defendant failed, however, to preserve his claim of error, in that he did not request a limiting instruction. (*People v. Quartermain* (1997) 16 Cal.4th 600, 630 [66 Cal.Rptr.2d 609, 941 P.2d 788].) In any event, immediately after hearing the instruction he challenges, the jury was told: "You shall consider, take into account and be guided by the following factors, if applicable," followed by a listing of each of the sentencing factors, section 190.3, factors (a) through

(k). We conclude the jury was properly guided in the exercise of its sentencing discretion. (See *People v. Medina* (1995) 11 Cal.4th 694, 770-771 [47 Cal.Rptr.2d 165, 906 P.2d 2] [trial court did not err in failing to specify sua sponte the irrelevant evidence the jury should ignore].)

Defendant next contends section 190.3, factor (d) (factor (d)), together with the related instruction, advising the jury it must consider whether or not the offense was committed while defendant was under the influence of extreme mental or emotional disturbance, is unconstitutionally vague because it gives the jury no direction as to whether such evidence is aggravating or mitigating. We have previously rejected the contention, as well as defendant's related argument that in referring to "extreme" mental or emotional disturbance, factor (d) precludes consideration of other, less extreme forms of disturbance. (*People v. Holt* (1997) 15 Cal.4th 619, 698-699 [63 Cal.Rptr.2d 782, 937 P.2d 213].) Defendant also contends the prosecutor, in closing argument dismissing his delusional condition as merely eccentric, converted factor (d) into an aggravating factor in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. We do not so read the challenged portion of the prosecutor's argument, which, after expressly advising the jury that factor (d) is a factor in mitigation, simply sought to persuade the jury to accord the defense evidence on the subject of defendant's mental disturbance little weight.

Defendant further asserts that all the remaining sentencing factors contained in section 190.3 and reflected in CALJIC No. 8.85 are unconstitutionally vague and arbitrary and result in unreliable sentences, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. He fails, however, to present any specific argument or authority for the assertion, and we reject it. None of the factors are shown to lack a commonsense core of meaning that criminal juries should be capable of understanding. (See *Tuilaepa v. California, supra,* 512 U.S. at p. 975 [114 S.Ct. at pp. 2636-2637].)

Defendant further contends the instructions given in his case violated the Eighth and Fourteenth Amendments to the United States Constitution by failing to require the jury to find aggravating factors beyond a reasonable doubt, and to find that any such proven aggravating factors outweighed the mitigating factors beyond a reasonable doubt. We have previously rejected these contentions, and defendant cites no reason to depart from our prior decisions. (*People v. Medina, supra,* 11 Cal.4th at p. 782; *People v. Hawthorne, supra,* 4 Cal.4th at p. 79.) Nor do the Fifth, Sixth, Eighth and Fourteenth Amendments require that the jury base its sentencing decision on written findings specifying the aggravating factors on which it relied.

(*People v. Fauber* (1992) 2 Cal.4th 792, 848 [9 Cal.Rptr.2d 24, 831 P.2d 249].) Contrary to defendant's argument, the provisions of California's death penalty statute do not violate the Fifth, Sixth, Eighth and Fourteenth Amendments by the lack of comparative or intercase proportionality review. (*People v. Crittenden* (1994) 9 Cal.4th 83, 156 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Defendant argues that the absence of procedural safeguards employed by other states in the operation of their death penalty laws renders this state's law unconstitutional under the Fifth, Sixth, Eighth and Fourteenth Amendments. As defendant acknowledges, however, we have previously rejected this argument (e.g., *People v. Sully, supra,* 53 Cal.3d at pp. 1251-1252), and he fails to convince us to reconsider this conclusion. Because we have found no error in the sentencing factors and instructions given in this case, defendant is not entitled to reversal of his sentence on the grounds asserted.

### D. *Unreliability of judgment due to defendant's insanity*

 ██ ██ Defendant urges reversal of the judgment as unreliable under the Eighth Amendment to the United States Constitution due to his insanity at the time of trial and at the time of the incident involving the young child, which was offered in aggravation.[25] We have previously addressed defendant's claims concerning his competency to stand trial (*ante,* at pp. 125-139) and, because he fails to elaborate on the concept of insanity at the time of trial, we devote no further analysis to the latter point. We therefore focus on the contention that the judgment must be reversed because defendant was insane at the time of the aggravating incident.

 The test of legal insanity in California is the rule in *M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng.Rep. 718, 722],[26] as adopted by the electorate in June 1982 with the passage of Proposition 8. That

---

[25]With no supporting argument, and merely by means of argument headings, defendant also asserts the death judgment is unreliable because he was insane at the time of the capital offense. The point is not properly raised (see *People v. Ashmus* (1991) 54 Cal.3d 932, 985, fn. 15 [2 Cal.Rptr.2d 112, 820 P.2d 214]) and clearly lacks merit. As a matter of state law, a defendant may not raise for the first time on appeal the issue of his sanity at the time of the capital offense; a defendant who does not plead not guilty by reason of insanity is conclusively presumed to have been sane at the time of the offense charged. (§ 1016.) As a matter of federal constitutional law, defendant cites no evidence calling into question the validity of the presumption in this case and thus fails to show the unreliability of the judgment of guilt under the Eighth and Fourteenth Amendments. By citing *Ford v. Wainwright* (1986) 477 U.S. 399 [106 S.Ct. 2595, 91 L.Ed.2d 335], defendant also implies he may not be executed due to his insanity. As the Attorney General argues, however, to address defendant's sanity for purposes of execution at this time would be premature.

[26]"[T]o establish a defense on the ground of insanity, it must be clearly proved that, at the time of . . . committing the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." (*M'Naghten's Case,*

measure added section 25, subdivision (b), which provides: "In any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." Despite the use of the conjunctive "and" instead of *M'Naghten's* disjunctive "or," this court has interpreted the statute as recognizing two distinct and independent bases on which a verdict of not guilty by reason of insanity might be returned. (*People v. Skinner* (1985) 39 Cal.3d 765, 769 [217 Cal.Rptr. 685, 704 P.2d 752]; accord, *People v. Kelly, supra,* 1 Cal.4th at p. 533.)

With respect to the incident involving the young child, which was introduced in the penalty phase, defendant argues the evidence sufficiently demonstrated his insanity so as to render his sentence unreliable. For this proposition, defendant relies on the evidence that he accused Michael Harris, the father of the three-year-old boy, of teaching his son to "go around sucking guys' penises." We observe that defendant failed to object at trial to the admission of this evidence on the basis he now advances and thus has forfeited the claim. (*People v. Zapien* (1993) 4 Cal.4th 929, 979-980 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Even were we to address the claim, moreover, it lacks merit. While defendant's bizarre accusation does dovetail with the homophobic views he aired repeatedly during the trial and suggests the operation of a paranoid or delusional mind, it does not fairly reflect the whole incident. When initially confronted about why he had kicked the boy, defendant told Michael Harris he did not like children and Harris should keep his son out of defendant's yard or he would kick him again. Then, while defendant, Michael Harris, Danny Wisner and Sammy Wisner were discussing the incident, defendant suddenly flew into a rage and hit Danny Wisner in the eye. A sheriff's officer arrived and took defendant to county jail. A week later, Michael Harris and Danny Wisner were in Harris's backyard when defendant, from over the fence, pointed a revolver at them and warned: "I'm going to get you guys for what you've done to me. I'm going to get your family." As the Attorney General observes, the evidence tended strongly to show that defendant acted out of anger and vengefulness rather than an insane delusion. Defendant fails to show that he was insane at the time of the incident and thus to cast doubt on the reliability of the judgment.

E. *Disproportionality of sentence*

 Defendant contends his death sentence is grossly disproportionate to his offense and thus violates the prohibition against cruel or unusual

*supra,* 10 Clark & Fin. at p. 210 [8 Eng.Rep. at p. 722]; see *People v. Kelly, supra,* 1 Cal.4th at p. 532.)

punishment contained in article I, section 17 of the California Constitution and the Eighth Amendment to the United States Constitution. Defendant emphasizes he was not the actual killer of Kenneth Stewart, and he argues at length what he terms the "problematic" aspects of the evidence in this case, suggesting he is not guilty of murder despite his conviction. Defendant further argues Brian Seabourn had a more serious history of criminal violence than he, and that the violent incidents in his own past must be understood in light of his long-standing mental illness. While acknowledging that the punishment meted out to coperpetrators is not normally relevant to intracase proportionality review (*People v. Arias* (1996) 13 Cal.4th 92, 193 [51 Cal.Rptr.2d 770, 913 P.2d 980]), he insists that, in this case, the disparity between his sentence and Seabourn's reflects arbitrary application of the death penalty in violation of the state and federal Constitutions.

Although defendant's crime is not the most heinous ever to be subjected to the ultimate penalty, we cannot say as a matter of law that his punishment is grossly disproportionate to the gravity of his offense. The jury reasonably might have believed the sorry events in this case never would have occurred but for defendant's desire for vengeance, his furnishing of the murder weapon, and his provision of a material incentive to the killer. Defendant's contention that facts outside the record would cast doubt on this conclusion cannot be resolved on appeal but must await resolution in collateral proceedings.

F. *Death sentence for conspiracy; effect of section 654*

Defendant contends his sentence of death as to count II, conspiracy to commit murder, must be vacated as an unauthorized sentence for that crime. (See §§ 182, subd. (a) [punishment for conspiracy to commit murder is that prescribed for first degree murder], 189 [defining degrees of murder], 190.2 [providing for death penalty in case of first degree murder with one or more special circumstance findings].) Defendant further contends section 654 bars sentencing on a conviction for conspiracy to commit murder when sentence has been imposed on the murder itself, the only object of the conspiracy. (*People v. Moringlane* (1982) 127 Cal.App.3d 811, 819 [179 Cal.Rptr. 726].) The Attorney General, while noting the trial court did stay the sentence on count II pursuant to section 654, acknowledges the imposition of a death sentence on the conspiracy count was unauthorized. We therefore shall vacate the special circumstance alleged and found true as to count II and vacate the death sentence imposed for that count. Under our statutory power

to modify an unauthorized sentence (see § 1260),[27] we shall direct the trial court to issue an amended abstract of judgment reflecting the appropriate sentence for conspiracy to commit murder, which the Attorney General in this case agrees is imprisonment for 25 years to life (see § 182; *People v. Cortez* (1998) 18 Cal.4th 1223, 1226 [77 Cal.Rptr.2d 733, 960 P.2d 537]; cf. *People v. Rodriguez* (1998) 17 Cal.4th 253, 258 [70 Cal.Rptr.2d 334, 949 P.2d 31] [assuming that "a reviewing court has the power [under § 1260] when a trial court has made a mistake in sentencing, to remand with directions that do not inevitably require all of the procedural steps involved in arraignment for judgment and sentencing"]; *People v. Hines* (1997) 15 Cal.4th 997, 1080 [64 Cal.Rptr.2d 594, 938 P.2d 388] [in exercising its power under § 1260, this court will not substitute its judgment for that of the trier of fact with respect to discretionary sentencing decisions; by implication limiting exercise of statutory power to nondiscretionary correction of judgment]).

## DISPOSITION

Defendant's request for judicial notice is granted. The judgment is modified as follows: the special circumstance found true as to count II, conspiracy to commit murder, and the sentence of death imposed for the conspiracy conviction are vacated. The trial court is directed to send an amended abstract of judgment to the Department of Corrections reflecting a sentence of imprisonment for 25 years to life, stayed pursuant to Penal Code section 654, on count II. As so modified, the judgment is affirmed.

George, C. J., Kennard, J., Chin, J., and Moreno, J., concurred.

**BAXTER, J.,** Concurring.—I agree the death sentence for first degree financial-gain murder should be affirmed, and otherwise concur in the judgment as modified on appeal. In so doing, I express no view on whether, as a matter of law, defendant's conviction for conspiracy to commit murder properly triggered its own special circumstance finding and death verdict below. Nor is it clear that the majority is deciding this significant issue on its merits. Nonetheless, I accept my colleagues' decision to impose (and to stay) an indeterminate life term for the conspiracy count based solely on pragmatic considerations not fully disclosed by the majority opinion.

Providing no analysis of relevant statutory law, defendant claimed on the last page of his opening brief on appeal that special circumstance allegations

---

[27]Section 1260 provides: "The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances."

can never accompany a charge of conspiracy to commit murder, and that neither death nor life imprisonment without the possibility of parole can ever be imposed for this crime. The Attorney General—focused on upholding the guilt and penalty verdicts entered on the first degree murder count—did not oppose defendant's effort either to vacate the death sentence for conspiracy or to characterize that sentence as unauthorized. Instead, after an equally brief discussion, the Attorney General purported to "agree[ ]" that the death penalty cannot be imposed for conspiracy to commit murder. As a result, the merits of this claim have not been meaningfully briefed or orally argued by either party in this court. Under these circumstances, and for no other reason, I go along with the result reached in the majority opinion.

However, the punishment intended by the Legislature for conspiracy to commit murder seems to present a close and difficult question. (See Pen. Code, §§ 182, subd. (a) ["the punishment" for conspiracy to commit murder "shall be that prescribed *for murder in the first degree*," italics added], 190, subd. (a) ["*murder in the first degree shall be punished by death*, imprisonment in the state prison for life without the possibility of parole, or imprisonment in the state prison for a term of 25 years to life," italics added].) Indeed, the prosecutor in this case is evidently not the first to seek and obtain separate death sentences for murder and conspiracy to commit murder. (See, e.g., *People v. Padilla* (1995) 11 Cal.4th 891, 910, 916, 919 [47 Cal.Rptr.2d 426, 906 P.2d 388]; see also *People v. Marks* (1988) 45 Cal.3d 1335, 1338, 1339 & fn. 3 [248 Cal.Rptr. 874, 756 P.2d 260] [noting that defendant received death for murder for financial gain, and life without parole for conspiracy to commit such murder]; but see *Owen v. Superior Court* (1979) 88 Cal.App.3d 757, 760-762 [152 Cal.Rptr. 88] [holding that, under then existing statutory law, a charge of conspiracy to commit murder cannot include special circumstance allegations absent the victim's death].)

The Legislature may wish to clarify whether, and under what circumstances, the death penalty scheme appearing in section 190.1 et seq. of the Penal Code applies to the crime of conspiracy to commit murder. In the meantime, nothing said or done in the present case will prevent me from considering the range of punishment statutorily available for this serious offense if the issue is properly presented and fully litigated in another case.

**BROWN, J.,** Concurring.—I disagree with part of the majority's reasoning in affirming the trial court's exclusion of hearsay testimony concerning the Aryan Brotherhood's alleged role in the murder. According to the majority (maj. opn., *ante*, at pp. 153-154), Brian Seabourn's statement that the Aryan Brotherhood hired him to kill Kenneth Lawton Stewart did not meet the second prong of the penal interest exception to the hearsay rule because it

was not a declaration against his penal interest. (See *People v. Duarte* (2000) 24 Cal.4th 603, 610-611 [101 Cal.Rptr.2d 701, 12 P.3d 1110] [to fit within the penal interest exception, the proponent of the evidence "must show that . . . the declaration was against the declarant's penal interest"].) The majority reasons that: (1) "nothing about *who* hired Seabourn to kill Stewart made Seabourn more culpable than did the other portions of his statement" (maj. opn., *ante*, at p. 154); and (2) the identity of Seabourn's hirer was not an element of the crime of conspiracy (*id.* at pp. 153-154). The majority's reasoning is, however, dubious, because its definition of a declaration against penal interest is too narrow.

First, a declarant's statement may subject him to such a "risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true" even if the statement does not satisfy an element of a crime. (Evid. Code, § 1230.) For example, the statement may increase the likelihood of a criminal conviction by providing a motive for the crime or by leading the police to additional evidence against the declarant. In this case, Seabourn's statement that the Aryan Brotherhood directed him to kill Stewart enhanced his culpability by suggesting additional motives for the crime—i.e., Seabourn's affiliation with the Aryan Brotherhood and/or his desire to join or advance within the group. The excluded statements also could have pointed the police to additional evidence against Seabourn. In this sense, Seabourn's naming of the Aryan Brotherhood specifically disserved his penal interests. (*People v. Duarte*, *supra*, 24 Cal.4th at p. 612.)

Second, hearsay statements identifying coconspirators constitute declarations against penal interest if the statements are "an integral part of the statement in which" the declarant "implicated himself" (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 340 [68 Cal.Rptr.2d 61]), and do not shift blame or minimize the declarant's role in the crime (*id.* at p. 341). Here, Seabourn's identification of the Aryan Brotherhood as his hirer was integral to his inculpatory statements—that he performed a murder for hire. His statements did not shift blame or minimize his role in the murder. Thus, the excluded statements are declarations against penal interest. (See *id.* at pp. 336-341 [finding hearsay statements identifying coconspirators admissible under the penal interest exception].)

Nonetheless, this conclusion does not warrant reversal because defendant cannot meet the third prong of the penal interest exception: "that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte*, *supra*, 24 Cal.4th at p. 611.) At oral argument, defendant made a detailed presentation of the facts surrounding the excluded

statements to show their reliability. Unfortunately, defendant presented none of these facts to the trial court. In a classic example of the hazards of self-representation, defendant's offer of proof only highlighted the unreliability of the excluded testimony. As described by defendant, the proposed testimony from the first witness—Monty Ray Mullins—did not identify the victim in any way or exclude defendant as a coconspirator. Defendant also failed to mention the circumstances surrounding the excluded statements. Finally, Mullins testified at the offer of proof that Seabourn never said that the Aryan Brotherhood hired him to murder Stewart. After the court excluded Mullins from testifying about the Aryan Brotherhood, defendant did not even make an offer of proof as to his second witness—David Hager. He also made no effort to authenticate the letter implicating the Aryan Brotherhood and presented the court with no evidence to gauge the letter's reliability. Based on this record, the excluded hearsay statements were too unreliable to warrant admission. (*Ibid.*) Thus, the trial court did not abuse its discretion by excluding them notwithstanding defendant's persuasive contention that the exclusion of these statements deprived him of a critical defense. (See *In re Pratt* (1980) 112 Cal.App.3d 795, 937 [170 Cal.Rptr. 80], quoting *Davey v. Southern Pacific Co.* (1897) 116 Cal. 324, 330 [" '[I]t is judicial action, and not judicial reasoning or argument, which is the subject of review; and, if the former be correct, we are not concerned with the faults of the latter' "].) Accordingly, I reluctantly join my colleagues in affirming defendant's judgment of death.

Appellant's petition for a rehearing was denied March 13, 2002.